Jill M. **PERGINE**, Plaintiff,

v.

**PENMARK MANAGEMENT CO., INC.,** Donald Cafiero, and Christopher Cafiero, Defendants.

No. Civ.A. 03–3439.

United States District Court, E.D. Pennsylvania.

April 23, 2004.

Steven T. Stern, Philadelphia, PA, for Plaintiff.

Nancy Beth Abrams, Spector Gadon & Rosen, Philadelphia, PA, for Defendants.

## MEMORANDUM

EDUARDO C. ROBRENO, District Judge.

This is a sex discrimination, sexual harassment and retaliation action brought under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e, *et seq.*, and the Pennsylvania Human Relations Act ("PHRA"), 43 P.S. § 951, *et seq.* Presently before the Court are defendants' motion for summary judgment and plaintiff's motion for partial summary judgment. For the reasons that follow, defendants' motion shall be granted in part and denied in part and plaintiff's motion shall be denied.

## I. BACKGROUND FACTS [1]

Plaintiff Jill Pergine ("plaintiff") began employment at the offices of Penmark Management Co., Inc. ("Penmark") on July 3, 2000 as a trainee for an assistant property manager position. Plaintiff re-

---

1. These facts are mainly taken from the parties' joint statement of undisputed facts. When facts are disputed, the Court has ac- cepted the version of the non-moving party and has viewed them in the light most favor- able to the non-moving party.

ported directly to defendant Christopher Cafiero ("Mr. Cafiero"), who was a construction manager and property manager for Penmark.[2]

Sometime in December 2000, Mr. Cafiero invited plaintiff to a hockey game. Following the game, plaintiff performed oral sex on the Mr. Cafiero in a parking lot. This marked the beginning of what plaintiff acknowledges was, at first, a consensual relationship between plaintiff and Mr. Cafiero.[3]

The Penmark offices served as a frequent backdrop to the relationship. On numerous occasions, Mr. Cafiero and plaintiff engaged in oral sex and intercourse in the offices of Penmark, usually after office hours.[4] In addition, plaintiff and Mr. Cafiero went shopping together, exchanged love letters, and frequented sex clubs in the vicinity of Philadelphia.

About a month or so after the sexual relationship began, in January of 2001, plaintiff attempted to break off the relationship with Mr. Cafiero. Apparently unsuccessful at first, plaintiff again attempted to break off the relationship in June of 2001, but was rebuffed by Mr. Cafiero.

Plaintiff's romantic relationship with Mr. Cafiero continued following her attempted break-up in June of 2001. In July of 2001, plaintiff received her first annual review in July of 2001 during which she was advised by Mr. Cafiero of a number of deficiencies in her job performance.

Plaintiff again attempted to end the relationship in September of 2001. For a period thereafter, plaintiff and Mr. Cafiero stopped seeing each other romantically. But the relationship rekindled and by January of 2002, plaintiff again attempted to end the relationship. Notwithstanding the on-again and off-again status of the relationship, plaintiff told Mr. Cafiero in the Spring and Summer of 2002 that she "loved" him on at least two occasions following her last attempt to terminate the relationship.

Plaintiff was given her second anniversary review on July 19, 2002. Plaintiff was told by Mr. Cafiero at this time that she had problems with her attitude, that she was poorly looked upon by others within the office, and that she lacked independence. Plaintiff also admitted to Mr. Cafiero that she was disorganized.

About a month after her evaluation, plaintiff was granted an increase in her salary from $28,680.00 to $29,827.00. Plaintiff was also given $1,000 for classes and seminars, and ten "men-hours" in the next year for maintenance work to be performed on her home with the condition that she not discuss personnel issues with other employees, that she not discuss her salary until 30 days prior to her next anniversary, and that she comply with the terms set forth in the July 11, 2002 memorandum from Mr. Cafiero.[5]

2. The other defendants in this case are Penmark, Mr. Cafiero's employer, and Donald Cafiero, the president of Penmark and Mr. Cafiero's father.

3. According to statements (now part of the record) made by plaintiff to a psychiatrist in August 2003, plaintiff performed oral sex on Mr. Cafiero at his request and with the belief that her job and medical benefits were at stake if she did not comply with the request.

4. In her papers, plaintiff explains at great length and detail the nature of her sexual

relationship with plaintiff. Most of the details need not be repeated for the purposes of this memorandum.

5. The terms of the memorandum were that plaintiff report to work by 9 a.m. each morning, that plaintiff take only a one hour lunch break, that plaintiff work a minimum of eight hours each day and a minimum of 40 hours per week, that plaintiff keep a daily log of her hours, and that plaintiff control her emotional outbursts. The terms further provided that plaintiff would be terminated immediately if she falsified her daily time log and that plain-

Approximately, two weeks after granting plaintiff a raise and additional benefits, on August 20, 2002, Mr. Cafiero terminated plaintiff. According to Mr. Cafiero's deposition testimony, plaintiff was terminated at the behest of Donald Cafiero and Robert Sichelstiel because of plaintiff's "bad behavior" in the office. On the evening of the day of plaintiff's termination and on one other occasion during the week thereafter, Mr. Cafiero visited plaintiff's apartment and had sexual relations with plaintiff.[6] During each of these visits, plaintiff expressed to Mr. Cafiero the need to have her health benefits continued due to an ongoing medical illness from which she was suffering. She was never re-hired by Penmark.

On September 18, 2003, plaintiff filed a charge of discrimination with the EEOC and requested that the charge be cross-filed with the Pennsylvania Human Relations Commission (the "PHRC").[7] A right to sue letter issued on May 2, 2003. Plaintiff filed the instant action on June 6, 2003. On June 12, 2003, the PHRC indicated by letter to counsel for defendants that it had closed the case. An amended complaint was filed by plaintiff on June 25, 2003.

## II. DISCUSSION

### A. *The Standard for Summary Judgment.*

A court may grant summary judgment only when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving par-

ty is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). A fact is "material" only if its existence or non-existence would affect the outcome of the suit under governing law. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). An issue of fact is "genuine" only when there is sufficient evidence from which a reasonable jury could find in favor of the non-moving party regarding the existence of that fact. *Id.* In determining whether there exist genuine issues of material fact, all inferences must be drawn, and all doubts must be resolved, in favor of the non-moving party. *Coregis Ins. Co. v. Baratta & Fenerty, Ltd.,* 264 F.3d 302, 305–06 (3d Cir.2001) (*citing Anderson,* 477 U.S. at 248, 106 S.Ct. 2505).

Although the moving party bears the burden of demonstrating the absence of a genuine issue of material fact, in a case such as this, where the non-moving party is the plaintiff, and therefore, bears the burden of proof at trial, that party must present affirmative evidence sufficient to establish the existence of each element of his case. *Id.* at 306, 106 S.Ct. 2505 (*citing Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)). Accordingly, a plaintiff cannot rely on unsupported assertions, speculation, or conclusory allegations to avoid the entry of summary judgment, *see Celotex,* 477 U.S. at 324, 106 S.Ct. 2548, but rather, she "must go beyond the pleadings and provide some evidence that would show that there exists a genuine issue for trial."

---

tiff would have deductions made from her salary in the event she did not work the minimum of 40 hours per week.

**6.** Outside of these two encounters, the Court has found nothing in the parties' submissions indicating that plaintiff and Mr. Cafiero continued their romantic relationship following plaintiff's termination from Penmark.

**7.** The EEOC interviewed one of five potential witnesses identified by plaintiff and found plaintiff's claims unworthy of further investigation because that witness indicated that the relationship between plaintiff and Mr. Cafiero was consensual.

*Jones v. United Parcel Service.*, 214 F.3d 402, 407 (3d Cir.2000).

### B. . *Defendants' Motion for Summary Judgment.*

#### 1. *PHRA Claims: Exhaustion of State Remedies.*

■ As to all of plaintiff's PHRA claims, defendants argue that plaintiff has failed to exhaust her state administrative remedies because (1) the case was not "closed" at the time plaintiff filed the instant action and (2) because one year had not passed since the filing of plaintiff's instant action and the cross-filing of plaintiff's complaint with the PHRC.

By letter dated November 1, 2002, the PHRC notified plaintiff that her case was filed with the Commission. On June 12, 2003, the PHRC notified counsel for defendants that plaintiff's case was closed. The parties do not contest that the case is now closed before the PHRC.

The Pennsylvania statute concerning exhaustion provides that:

> If within one (1) year after the filing of a complaint with the Commission, the Commission dismisses the complaint or has not entered into a conciliation agreement to which the complainant is a party, the Commission must so notify the complainant. On receipt of such a notice the complainant shall be able to bring an action in the courts of common pleas of the Commonwealth based on the right to freedom from discrimination granted by this act.

43 P.S. § 962(c). The statute makes clear that if the complaint is dismissed by the PHRC *within* one year, a plaintiff may bring suit. *See Clay v. Advanced Computer Applications, Inc.*, 522 Pa. 86, 92, 559 A.2d 917 (1989). Thus, despite defendants arguments to the contrary, a plaintiff need not wait one year before filing a complaint if the PHRC has dismissed the case. *See Flagg v. Control Data*, 806 F.Supp. 1218, 1222 n. 1 (E.D.Pa.1992).[8]

Defendants also contend that the PHRA claims are untimely because the instant action was filed in this Court during the pendency of the PHRC proceedings. Even if this is so, an amended complaint was filed by plaintiff on June 25, 2003, after it is agreed that the PHRC proceedings were closed. Thus, to the extent that plaintiff's PHRA claims were unexhausted at the time of the filing of the original complaint, they were clearly exhausted at the time the amended complaint was filed; therefore, plaintiff's PHRA claims are not untimely. *See Price v. Philadelphia Electric Co.*, 790 F.Supp. 97, 99 (E.D.Pa.1992) (stating that an amended complaint can cure exhaustion defects); *see also Violanti v. Emery Worldwide A–CF Co.*, 847 F.Supp. 1251, 1258 (M.D.Pa.1994) (finding that PHRA exhaustion defects may be curable by the passage of time during the pendency of a civil action).

For these reasons, the Court finds that summary judgment is not proper on plaintiff's PHRA claims on the basis of untimeliness.

#### 2. *Title VII: Prima Facie Quid Pro Quo Sexual Discrimination.*

■ To establish quid pro quo sexual harassment, a plaintiff must show that her response to unwelcome sexual advances or

---

**8.** If a one year period of exclusive jurisdiction were required notwithstanding dismissal of the state case by the PHRC, a putative plaintiff could be placed in the situation where, having filed a federal lawsuit within 90 days of receipt of an EEOC right to sue letter as required by statute, *see* 42 U.S.C. § 2000e– 5(f)(1), she would be unable to bring supplemental state claims that have been dismissed by the PHRC in the same action as the federal claims on the sole basis that one year has not passed since her complaint was filed in the PHRC.

other verbal or physical conduct of a sexual nature was subsequently used as a basis for a decision about compensation, terms, conditions, or privileges of employment. *Farrell v. Planters Lifesavers Co.*, 206 F.3d 271, 281–82 (3d Cir.2000) (*citing Robinson v. City of Pittsburgh*, 120 F.3d 1286, 1296–97 (3d Cir.1997)).[9]

a. *"Unwelcome" Advances.*

Defendants argue that the consensual nature of plaintiff's relationship with Mr. Cafiero automatically takes plaintiff's claims "outside of Title VII's purview" as a matter of law. *Porchia v. Cohen*, No. 98–3643, 1999 WL 357352, at *6, 1999 U.S. Dist. LEXIS 8239, at *18 (E.D.Pa. Jun. 3, 1999). The Court disagrees that the answer is so clear cut under the circumstance of this case.[10]

■ A relationship that is consensual at its inception does not necessarily preclude a quid pro quo claim by an employee, if the employee later attempts to break off the relationship, and suffers an adverse employment action as a result. *See Hartman v. Sterling, Inc.*, No. 01–2630, 2003 WL 22358548, at *7, 2003 U.S. Dist. LEXIS 18140, at *23 (E.D.Pa.2003) ("genuine issues of material fact as to the unwelcome nature of [defendant's] sexual advances" notwithstanding initial consensual relationship); *Perks v. Town of Huntington*, 251 F.Supp.2d 1143, 1157 (E.D.N.Y.2003) (consensual relationship does not provide subsequent "carte blanche to harass employee with impunity"); *Schrader v. E.G. & G., Inc.*, 953 F.Supp. 1160, 1168 (D.Colo.1997) ("consensual relationship with [defendant] does not change analysis under Title VII"); *Babcock v. Frank*, 729 F.Supp. 279, 287 (S.D.N.Y.1990) ("Title VII has been held to provide protection against such quid pro quo conduct and that protection ought not be withdrawn merely upon a showing that the victim of harassment had in the past entered into a consensual relationship with the perpetrator.").

■ In the instant case, plaintiff alleges that she was told Mr. Cafiero that "if [she]

**9.** The Supreme Court has explained that quid pro quo sexual harassment may arise when a plaintiff establishes that a "tangible employment action resulted from a refusal to submit to a supervisor's sexual demands." *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 753, 118 S.Ct. 2257, 141 L.Ed.2d 633 (1998). A hostile work environment claim involves "unfulfilled threats" and requires a showing of "severe or pervasive conduct." *Id.* at 754, 118 S.Ct. 2257.

**10.** In *Pipkins v. City of Temple Terrace*, an Eleventh Circuit decision cited by the defendants, plaintiff entered into an "on-again, off-again" personal relationship with her supervisor. 267 F.3d 1197, 1199 (11th Cir.2001). Although plaintiff ceased having sexual relations with her supervisor after some time, he continued to pursue plaintiff romantically. *Id.* Following the end of the relationship, plaintiff's job performance scores began to drop, even after her supervisor was forced to leave because of his actions. Plaintiff eventually resigned and brought suit claiming constructive discharge. *Id.*

The Eleventh Circuit found that most of the actions complained of by plaintiff were committed by her new supervisor. *Id.* at 1200. Any actions attributable to her new supervisor were the result of "personal animosity" and not motivated by sex according to the court. *Id.* As for the actions of the old supervisor (the one with whom plaintiff had a relationship), the court found that his actions were "taken because of his disappointment in their failed relationship," which again, the court found not to be because of sex. *Id.* at 1201. For these reasons, the court granted summary judgment on plaintiff's constructive discharge claim, but noted that it did not "today decide that once a consensual relationship between a supervisor and a subordinate is established, the subordinate could never then become a victim to quid pro quo sexual harassment by that supervisor subsequent to the termination of the relationship." *Id.* Thus, the holding in *Pipkins* was limited to the "facts and circumstances" of that case. *Id.*

was good to him, that [she] would have it made at Penmark" following her January 2001 attempt to end the relationship. Pergine, Dep. Tr., at 82. When she again attempted to end the relationship in June 2001, plaintiff alleges that Mr. Cafiero got very angry, told plaintiff she didn't know what she was doing and threatened her. *Id.* Following the September 2001 attempt to call off the relationship, plaintiff states, in her deposition, that Mr. Cafiero,

> told me that he had spent a lot of time and money in this relationship and he was very, very angry. And he basically said to me that if there wasn't going to be a sexual relationship, there wasn't going to be a job.

*Id.* at 83.

Drawing all reasonable inferences in plaintiff's favor, the Court finds that genuine issues of material fact exist as to whether, once plaintiff attempted to sever the romantic bond with Mr. Cafiero but was rebuffed, plaintiff's subsequent involvement with Mr. Cafiero was based on unwelcome advances. To that end, while plaintiff's involvement with Mr. Cafiero concededly was consensual at first, once plaintiff attempted to end the relationship, plaintiff was greeted on numerous occasions with comments that indicated that her position with Penmark was dependent on her continuing her relationship with Mr. Cafiero.[11] Under the circumstances, "[t]he correct inquiry is whether [plaintiff] by her conduct indicated that the alleged sexual advances were unwelcome, not whether her actual participation in sexual intercourse was voluntary." *Meritor Savings Bank, FSB v. Vinson,* 477 U.S. 57, 68,

106 S.Ct. 2399, 91 L.Ed.2d 49 (1986). While plaintiff may have voluntarily entered at first into a relationship with Mr. Cafiero, there is a genuine issue of material fact whether after plaintiff attempted to terminate the relationship, the subsequent sexual overtures by Mr. Cafiero were unwelcome.

b. *"Causal Link" Between Plaintiff's Response and a Subsequent Employment Decision.*

Not only must plaintiff establish that defendant's conduct was unwelcome, she must also establish a causal link between her response to the unwelcome advances and a subsequent employment decision. *See Burlington,* 524 U.S. at 753, 118 S.Ct. 2257; *Farrell,* 206 F.3d at 281. A plaintiff may rely on a "broad array" of evidence to show the requisite cause and effect. *Id.* at 284. The Third Circuit has instructed that plaintiff may establish causation, for example, by pointing to evidence of "hostility or repeated demands for sexual favors," *id.* at 282, evidence "that the employer gave inconsistent reasons for terminating the employee," *id.* at 281, and evidence of "close timing" between plaintiff's response and termination, *id.* at 285.

In her EEOC charge, plaintiff alleges that beginning in November 2001, she and Mr. Cafiero engaged in oral sex in the office and at work sites and that Mr. Cafiero "fondled" plaintiff's breasts in the office and at work sites. Plaintiff also alleges that, as late as July 2002, she told Mr. Cafiero to discontinue harassing her but that Mr. Cafiero did not stop.[12]

---

**11.** Plaintiff's EEOC charge also indicates that, between November 2001 and July 2002, she told Mr. Cafiero to discontinue harassing her, but that he did not. Def. Mem. Sum. Judg., Exhibit F. Defendants have not objected to the statements made in this document as not being competent evidence. Indeed,

defendants rely on statements made in this document to support their contention that plaintiff's relationship with Mr. Cafiero was consensual in nature.

**12.** All of these allegations are made in plaintiff's EEOC Charge of Discrimination.

When all reasonable inferences are drawn in plaintiff's favor, the Court finds that plaintiff has offered sufficient evidence from which a trier of fact could find a causal link between plaintiff's stated desire to terminate the relationship with Mr. Cafiero's and plaintiff's subsequent termination from Penmark. Not only does the evidence support the claim that Mr. Cafiero threatened plaintiff with termination, there is also a relatively close temporal proximity between plaintiff's latest attempt to express her displeasure with Mr. Cafiero's sexual advance in July of 2002 and plaintiff's subsequent termination in August of 2002. Further, as discussed in greater detail below, there are inconsistencies in defendants' proffered reason for plaintiff's termination.

For these reasons, the Court finds that genuine issues of material fact exist as to whether or not plaintiff's termination from Penmark was precipitated by her response to Mr. Cafiero's sexual advances.

### c. *McDonnell Douglas Burden Shifting Framework.*

As instructed by the Supreme Court in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), once a plaintiff has established a prima facie case of discrimination, the burden shifts to the defendant to articulate some legitimate, non-discriminatory reason for the employee's termination. *Josey v. John R. Hollingsworth Corp.,* 996 F.2d 632, 637–38 (3d Cir.1993). If the defendant meets this burden of production, plaintiff must be given the opportunity to prove by a preponderance of the evidence that the legitimate reasons proffered by the defendant are pretextual. *Id.* Pretext may be shown by directly persuading the court that a discriminatory reason more likely motivated the employer or it may be shown indirectly by demonstrating that the defendant's proffered reason lacks credence. *Id.*

Here, defendants argue that plaintiff was terminated from her position because of her job performance and not because of her sex. In support of this contention, defendants point to a litany of performance-related issues including plaintiff's lack of computer skills, her lack of organizational skills, her lack of confidence in her abilities, her lateness to work and extended lunch breaks, her lack of independence, her lack of communication skills, and her inability to delegate work. Moreover, Mr. Cafiero has indicated, in his deposition, that plaintiff was terminated because Penmark's business was on a "severe downslide" and the extra help was no longer needed. C. Cafiero, Dep. Tr., at 106–107.

While there is ample evidence in support of defendants' contention with respect to plaintiff's job-related performance, the uncontested fact that plaintiff received an almost 4 percent annual pay increase, a $1000 benefit to take after-work computer courses, and 10 "men-hours" of maintenance work by Penmark to be performed on plaintiff's home, just *two weeks* before her termination belies defendants argument and may cast doubt on the proffered reason for plaintiff's termination. At the very least, Mr. Cafiero's explanation for plaintiff's termination is facially inconsistent with the reasons given at depositions by Donald Cafiero and Robert Sichelstiel concerning plaintiff's job performance. "[E]vidence of inconsistencies and implausibilities in the employer's proffered reasons for discharge reasonably could support an inference that the employer did not act for non-discriminatory reasons...." *Josey,* 996 F.2d at 638 (*quoting Chipollini v. Spencer Gifts, Inc.,* 814 F.2d 893, 900 (3d Cir.), *cert. dismissed,* 483 U.S. 1052, 108 S.Ct. 26, 97 L.Ed.2d 815 (1987)). In this case, the Court finds that a reasonable jury could find that defendants' proffered explanation for the termination of

plaintiff is not worthy of credence, and therefore, pretextual.

In view of the above, the Court concludes that genuine issues of material fact exist as to whether Mr. Cafiero's conduct was unwelcome, whether plaintiff's termination was the result of her response to her stated interest in terminating her initial relationship with Mr. Cafiero, and whether defendants' proffered legitimate explanation for plaintiff's termination is pretextual. For at least these reasons, summary judgment is not proper with respect to plaintiff's quid pro quo Title VII claim.

### 3. Hostile Work Environment Claim.

■ To prevail on a hostile work environment claim, plaintiff must establish that: (1) plaintiff suffered intentional discrimination because of her sex; (2) the discrimination was pervasive and regular; (3) the discrimination detrimentally affected the plaintiff; and (4) the discrimination would detrimentally affect a reasonable person of the same sex in the same position. *Suders v. Easton,* 325 F.3d 432, 441 (3d Cir.2003) (*citing Andrews v. City of Philadelphia,* 895 F.2d 1469, 1482 (3d Cir. 1990)).

■ Here, plaintiff alleges that she engaged in oral sex and intercourse with the Mr. Cafiero and that Mr. Cafiero fondled plaintiff's breasts while at the office and at work sites between November 2001 and July 2002. Plaintiff also alleges that, during the summer of 2002, Mr. Cafiero forced plaintiff to sit in her office in the dark without her computer and telephone; that Mr. Cafiero spit in plaintiff's coffee; that Mr. Cafiero hung up the telephone while plaintiff was talking to tenants; and that Mr. Cafiero threw things and disheveled the contents of plaintiff's desk. On at least three occasions, plaintiff attempted to end the relationship with the Mr. Cafiero. Each of these times, Mr. Cafiero allegedly threatened plaintiff and in September of 2001, Mr. Cafiero specifically told plaintiff "if there wasn't going to be a sexual relationship, there wasn't going to be a job."

Given this alleged conduct, the Court finds that genuine issues of material fact exist in connection with plaintiff's hostile work environment claim precluding judgment as a matter of law. Thus, defendants' motion for summary judgment on this claim shall be denied.

### 4. Retaliation

Plaintiff has indicated in her papers that the retaliations claim is being withdrawn. Plaint. Resp. Mem. at 5 n. 3. Accordingly, the Court shall grant summary judgment against plaintiff in favor of defendants on this claim.

### 5. Piercing the Corporate Veil.

Defendants also seek summary judgment on plaintiff's claim that the corporate veil should be pierced in this case so as to impose liability on the individual shareholders of Penmark. The Court finds that severance of this issue from the underlying sex discrimination claims would be conducive to expedition and economy, and will therefore order a separate trial pursuant to Fed.R.Civ.P. Rule 42(b). The Court shall revisit this issue at a later time, if necessary.

### C. Plaintiff's Motion for Partial Summary Judgment.

Plaintiff's motion for partial summary judgment argues, in essence, that Penmark should be vicariously liable for the actions of Mr. Cafiero. This argument is at least premature because there has been no finding that Mr. Cafiero's conduct constituted sexual harassment and/or sexual discrimination. Accordingly, summary judgment is not proper at this time.

## III. CONCLUSION

In view of the above, defendants' motion for summary judgment shall be granted in part and denied in part in. Summary judgment is proper in favor of defendants' and against plaintiff as to plaintiff's claim of retaliation. Summary judgment is not proper in favor of defendants and against plaintiff as to plaintiff's claim of quid pro quo sex discrimination and hostile work environment sexual harassment under Title VII and the PHRA. Plaintiff's motion for partial summary judgment shall be denied.

### ORDER

**AND NOW,** this 22nd day of **April 2004,** for the reasons set forth in the accompanying memorandum, it is hereby **ORDERED** that defendants' motion for summary judgment (doc. no. 9) is **GRANTED in part** and **DENIED in part.**

It is **FURTHER ORDERED** that plaintiff's motion for partial summary judgment (doc. no. 10) is **DENIED.**

It is **FURTHER ORDERED** that **JUDGMENT** shall be **ENTERED** in favor of defendants and against plaintiff on the retaliation claim.

It is **FURTHER ORDERED** that for the purposes of trial, the issue of piercing the corporate veil shall be **SEVERED** from the issue liability.

**AND IT IS SO ORDERED.**