# In the
# United States Court of Appeals
## For the Seventh Circuit

No. 05-3123

DELORES AMMONS-LEWIS,

*Plaintiff-Appellant,*

*v.*

METROPOLITAN WATER
RECLAMATION DISTRICT OF
GREATER CHICAGO,

*Defendant-Appellee.*

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 03 C 885—**Matthew F. Kennelly**, *Judge.*

ARGUED NOVEMBER 29, 2006—DECIDED MAY 30, 2007

Before BAUER, CUDAHY, and ROVNER, *Circuit Judges.*

ROVNER, *Circuit Judge.* Delores Ammons-Lewis sued her employer, the Metropolitan Water Reclamation District of Greater Chicago (the "District"), for sex discrimination pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-2(a)(1) ("Title VII"), and the denial of equal protection in violation of the Civil Rights Act of 1871, 42 U.S.C. § 1983 ("section 1983"). A jury found in favor of the District on the Title VII claims, and the district court entered judgment in favor of the District on those claims as well as Ammons-Lewis' parallel claims under section 1983. Ammons-Lewis appeals, challenging

certain of the district court's decisions that she contends deprived her of a fair trial. We affirm.

**I.**

The District is a unit of local government that serves as the sanitary district for Cook County, Illinois, operating various water collection and treatment facilities. Ammons-Lewis has worked for the District since 1986 and at the time of the events underlying this case held the position of operating engineer. Ammons-Lewis filed this suit against the District alleging, in relevant part, that she was subjected to a hostile work environment based on her sex.[1] She alleged in particular that she was regularly and involuntarily exposed to pornography and sexually-oriented drawings in the workplace and also that she experienced unwelcome physical contact and verbal remarks of a sexual nature. She alleged that she complained repeatedly about these matters but that the District failed to respond in a timely and reasonable manner. On the District's motion, the district court ordered that the Title VII claims be tried separately from the section 1983 claims. With the parties' consent, the Title VII claims were tried first. All were in agreement that if Ammons-Lewis did not prevail on her Title VII

---

[1] Ammons-Lewis's complaint also included claims under the Americans with Disabilities Act of 1990, 42 U.S.C. § 12101 et seq. (the "ADA"), the Family and Medical Leave Act of 1993, 29 U.S.C. § 2601 et seq., and for retaliation in violation of both the ADA and Title VII. The district court granted summary judgment on these claims in favor of the District, leaving only the Title VII hostile environment and section 1983 claims for trial. R. 51, 70; 2004 WL 2453835 (N.D. Ill. Nov. 1, 2004). The latter claims are the only ones at issue in this appeal; Ammons-Lewis does not challenge the disposition of the other claims.

claims, she would be unable to proceed with her section 1983 claims. A trial on the Title VII claims took place over the course of eight days in June 2005. A jury found in favor of the District on those claims, and the district court subsequently entered judgment in favor of the District on the section 1983 claims. *See* R. 129-10 at 1529; R. 92, 93.

**II.**

A.  Juror selection

Ammons-Lewis contends that the district court erred in its handling of five jurors. Each of the five had some characteristic or circumstance which, in the view of Ammons-Lewis, rendered him or her unqualified to serve on the jury. In one instance, the district court eventually did dismiss the juror in question, but the other four served through the conclusion of the trial. In each instance, Ammons-Lewis argues, the district court failed to address the disabling matter properly, thereby depriving her of a qualified and impartial jury and in turn a fair trial. A brief description of the relevant facts as to each juror is in order.

In his answers to the juror questionnaire that each member of the venire was asked to complete, juror Bright disclosed that he experienced anxiety. The district court questioned him about this in chambers in the presence of counsel. Bright explained that he had a highly stressful job and that he had been diagnosed with an anxiety condition approximately one year prior to the trial. He had taken medication for the condition for a period of six months, eventually discontinued the medication, and at the time of trial was doing fine provided that he took certain prophylactic measures. Bright indicated that he had disclosed the condition because he was "a little wor-

ried" about how he would handle the unfamiliar experience of jury service. R. 129-2 at 112. After the court explained to him what jury service would entail, he indicated that he "should be okay," and added that he had not had not experienced any difficulty during jury selection. *Id.* at 113. Satisfied that Bright was capable of serving on the jury, the district judge said that "we'll just work with that" and instructed Bright to let the court know if he experienced any difficulty. *Id.* Later, in the midst of the trial, Bright sent the court a note disclosing that while "the plaintiff's attorney was asking small questions that didn't seem important," he had begun to experience difficulty that he described as "getting dizzy, nervous and anxious," and feeling bothered by things that would normally not trouble him. R. 129-5 at 764. Bright's note added that he would consult his physician. After discussing the note with counsel, the court without objection had a brief one-on-one conversation with Bright in chambers, wherein Bright advised the court that he was fine as long as the trial kept moving along and agreed to advise the court if he needed a break or any other accommodation to deal with his anxiety. *Id.* at 765. Bright reported no further difficulty and was later chosen to be the presiding juror.

During the trial, witness Stephen Kelly, one of the individuals whom Ammons-Lewis accused of harassing her, reported to defense counsel during a break in his testimony that he believed he recognized Bright as his niece's former fiancé. R. 129-5 at 660-61. However, he recalled the first name of his niece's fiancé as being "Brian," which, because that was not Bright's first name, led defense counsel to think he was mistaken. *Id.* at 661. On learning of the situation, the court agreed that "[i]t's a different person" and let the matter drop without further action. *Id.*

Juror Robinson disclosed on the third day of trial, during the plaintiff's testimony, that he was acquainted with one

of the witnesses in the case. Robinson had indicated during voir dire that he did not know anyone on the parties' list of anticipated witnesses. But after the trial began, he noticed on a document shown to the jury the name and address of Willie Davis, an individual that Ammons-Lewis had identified as one of her harassers and who would later testify in the case. Robinson realized at that point that he knew Davis, who lived a block away from him. After the trial broke for lunch, Robinson apparently approached the judge and tried to inform him orally of his conflict, but at the judge's request he instead put the matter in writing. When the trial reconvened that afternoon, the judge reported the contents of Robinson's note and excused him from the jury after consulting with the parties. R. 129-4 at 541-43, 547-48, 549.

Juror Astorga completed his juror questionnaire in English and disclosed no difficulty understanding or speaking English during voir dire. After the jurors were selected and the trial was about to get under way, the court advised the jurors that they would be given notebooks and writing implements. Astorga then advised the court that "[i]f we need to be writing, I can't write English." R. 129-2 at 131. The court advised Astorga that his service as a juror required the ability to listen but not to write anything down. *Id.* This apparently satisfied Astorga, who expressed no further concern.

Juror Reisman disclosed during voir dire that she had trouble hearing. R. 129-2 at 39. However, Reisman added that she had no difficulty hearing the district judge so long as he spoke into the microphone. *Id.* This satisfied the court that she was able to serve on the jury: "Okay. We've got microphones everywhere and we'll deal with that." *Id.* Periodically during the trial, the judge admonished witnesses to speak directly into the microphone and asked whether everyone in the courtroom could hear adequately.

Finally, juror Nahin disclosed during voir dire several facts concerning the litigation and employment history of her relatives and herself. First, Nahin had a great aunt with a penchant for filing lawsuits; however, she had no contact with her aunt and knew nothing about the suits. R. 129-2 at 94. Second, Nahin reported that her sister had been discharged from a job five years earlier, although that termination had not resulted in any grievance or litigation. *Id.* at 94-95. Finally, Nahin indicated that she herself had been treated unfairly at a previous job; she clarified that the unfairness she experienced did not involve discrimination or harassment. *Id.* at 95. Nahin agreed that she could put her own experience and that of her sister aside and that it would not prevent her from being fair in this case. *Id.* at 94-95.

Ammons-Lewis contends that the service of these individuals on the jury, collectively and individually, deprived her of a fair trial. With respect to juror Bright, she contends that in view of Bright's anxiety condition and what she perceives to have been his ambivalence about serving as a juror, the district court should have excused him at once. Alternatively, she maintains that the court was obliged to remove Bright once he disclosed that he was experiencing stress triggered by her attorney's focus on what struck him as "small questions that didn't seem important." R. 129-5 at 764. She also faults the court for failing to question Bright about his possible connection with witness Stephen Kelly's niece rather than simply assuming that Kelly was mistaken about the first name of his niece's fiancé. Juror Robinson, by contrast, did have an acknowledged connection with witness Willie Davis and was excused once he recognized and disclosed that he knew Davis. Nonetheless, Ammons-Lewis faults the court for not acting more quickly once it learned of Robinson's conflict; apparently, she believes that the court should have immediately dismissed or sequestered

Robinson on receipt of his note explaining his familiarity with Davis rather than waiting for the trial to resume after lunch. As to juror Astorga, Ammons-Lewis argues that his inability to write English should have disqualified him from jury service, given that it may have prevented him from taking notes to help him recall evidence presented over the course of the eight-day trial. (She does not take into consideration the possibility that Astorga could have taken notes in his native language.) When juror Reisman disclosed a hearing impairment, Ammons-Lewis argues, the court should have inquired whether Reisman had the benefit of a hearing aid and was able to hear even those witnesses who might not speak directly into the microphone. Finally, given Nahin's disclosure that she had a litigious great aunt, the court, in Ammons-Lewis's view, should have questioned Nahin about what feelings Nahin had regarding parties who file lawsuits.

The threshold and ultimately dispositive point about these arguments, however, is that none of them were raised below. The plaintiff and her counsel of course participated in the voir dire process, were aware of the circumstances that Ammons-Lewis now believes disqualified these jurors, and yet never voiced an objection to any of these individuals serving on the jury or with the court's handling of the jurors. In her briefs, Ammons-Lewis invites us to review the district court's decisions as to the fitness of individual jurors for plain error, relying on the standard formulation of plain error that we employ in criminal cases. Yet, this is a civil case, and we have repeatedly noted that plain error has an extremely limited application (at most) in the civil context. *E.g.*, *Higbee v. Sentry Ins. Co.*, 440 F.3d 408, 409 (7th Cir. 2006); *Stringel v. Methodist Hosp. of Indiana, Inc.*, 89 F.3d 415, 421 (7th Cir. 1996). Ammons-Lewis has not acknowledged this point, let alone attempted to demonstrate why the circumstances here plausibly might fall within one of the

narrow categories of civil errors that we could recognize
as plain error. Having reviewed the record, we have no
reason to question the district court's handling of the
jurors Ammons-Lewis has challenged after the fact, let
alone to conclude that a potential miscarriage of justice
occurred because the district court did not sua sponte
exclude these jurors (or in Robinson's case, exclude him
sooner) when potential problems were flagged. Given that
Ammons-Lewis did not preserve these challenges and has
made no effort to demonstrate why the circumstances
are so extraordinary that we should overlook her forfei-
ture, we deem these challenges waived and consider them
no further.

B.  Admission of photograph of Ammons-Lewis and one of
    her alleged harassers

   Ammons-Lewis next contests the district court's decision
to admit into evidence a photograph that she and witness
Willie Davis had posed for on a social occasion.[2] Some
background is necessary to establish the context for our
analysis.

   Davis was a co-worker of Ammons-Lewis and, as noted,
he was also one of the people she accused of sexually
harassing her. Ammons-Lewis testified that Davis had
begun to proposition her sexually in 2000, when she was

_____

[2] The briefs reflect a disagreement between the parties as to
whether the district court admitted the photograph into evidence
for any and all purposes or instead allowed the District to use it
solely for impeachment purposes. Our review of the record
suggests that the photograph was admitted into evidence without
restriction, and ultimately the District's counsel conceded as
much at argument, although he maintained that the photograph
was primarily relevant to Ammons-Lewis's credibility as a
witness.

divorcing her husband. She indicated that she consistently rebuffed his requests, but he continued to proposition and otherwise harass her. She testified that she complained about the harassment to no avail. The harassment she described culminated in an incident that took place in December 2001. Ammons-Lewis testified that she was near the end of her shift when she encountered Davis, who was to relieve her. According to Ammons-Lewis, Davis tried to engage her in sexual banter, began tugging provocatively at his clothes, and sexually propositioned her. Ammons-Lewis at first tried to ignore him and when that did not work, she told him that they had no need to speak to one another unless it was about work. This evidently prompted Davis to unleash a tirade of profanities at her. Then the confrontation became physical, according to Ammons-Lewis. She testified that when she turned her back on him to make a phone call, Davis came up from behind her, wrapped his arms around her neck, and put her in a choke hold so tight that she found it difficult to breathe. She used her car keys to scratch his hands in an effort to break free, but Davis responded by scratching her face. The incident ended when one of their co-workers came on the scene and separated the two of them. After eventually seeking treatment at a hospital, Ammons-Lewis filed a complaint with the Chicago police about this incident. R. 129-3 at 276-81, 288-91.

In advance of trial, Ammons-Lewis filed a motion seeking to preclude any insinuation that she and Davis had been romantically involved with one another at some time prior to the events underlying her suit. R. 66. Ammons-Lewis acknowledged that she had had some contact with Davis outside of the workplace: Davis was a family friend, and the two of them had attended some of the same events outside of the office. *Id.* ¶ 2. But Ammons-Lewis denied that she and Davis had ever dated, and apparently she expected (wrongly, as it turned out) that

Davis would testify to the same effect. *Id.* ¶¶ 4-5. None-theless, she had some expectation that one or more witnesses would insinuate otherwise, and she sought to preclude them from doing so given that she expected both Davis and herself to disclaim any such relationship. *Id.* ¶¶ 6-9. The District quickly disabused Ammons-Lewis of the notion that Davis would deny having dated her and indicated in its opposition to her motion that it planned to present testimony from multiple witnesses with knowledge of their relationship that they had, in fact, been romantically involved. R. 58. On that basis, the district court denied the motion, R. 67, although it indi-cated that any testimony based on what a witness "thought or assumed" about the nature of their relationship would not be allowed, R. 129-1 at 23.

As expected, there was conflicting testimony on this point at trial. Davis testified that he and Ammons-Lewis had dated one another for substantial periods of time prior to the events underlying her complaint. R. 129-5 at 878-80. Ammons-Lewis, on the other hand, testified that she and Davis had never dated. She indicated that Davis was a friend to one of her cousins and a couple of her brothers and that she and Davis had attended some of the same social events outside of the office, but she denied that they had attended any such events together as a couple. R. 129-3 at 269, 412; R. 129-4 at 455-56, 460.

The photograph that Ammons-Lewis contends should have been excluded was first disclosed while she was on the witness stand at trial. Ammons-Lewis's direct exami-nation had concluded late in the week, and her cross-examination had commenced but not concluded before the trial broke for the weekend. On the following Monday morning, defense counsel disclosed that over the weekend, Davis had discovered a photograph of Ammons-Lewis, Davis, and four other individuals at a party that took place a number of years prior to the trial. The defense sought

permission to introduce the photograph for the purpose of impeaching Ammons-Lewis's prior testimony denying any sort of dating or romantic relationship with Davis. Ammons-Lewis objected to the photo, arguing among other things that the photo should have been produced in discovery and that disclosure of the photograph would prejudice her because she had not had the opportunity to explain the photograph during her testimony on direct examination. The district court overruled her objection, but granted Ammons-Lewis a few moments to review the photo with her counsel before her cross-examination resumed and she was questioned about the photo. R. 129-4 at 450-53. The photo was subsequently shown to the jury and admitted into evidence. *Id.* at 461.

Not surprisingly, Ammons-Lewis and Davis gave divergent testimony about the circumstances of the photograph. Ammons-Lewis testified that the photograph had been taken at a fundraiser or similar function that she had attended some ten years earlier along with her brothers and her cousin. Although Davis had also attended the event, she testified that they had not attended that party or any other as a couple. *Id.* at 456-61, 557-58. Davis, on the other hand, recalled the event as a birthday party and, more to the point, said that Ammons-Lewis had come to the event as his date. R. 129-5 at 882-83.

Ammons-Lewis contends that the admission of the photograph was erroneous given that it was not produced during pre-trial discovery and only served to prolong what she sees as an irrelevant exploration into the nature of her relationship with Davis, thereby distracting the jury from the relevant question of whether Davis had harassed her in the workplace.

We review the district court's evidentiary rulings for abuse of discretion, *e.g., Thompson v. City of Chicago*, 472 F.3d 444, 453 (7th Cir. 2006), and we cannot say that its

ruling in this instance was unreasonable. We agree with Ammons-Lewis that whether she had dated Davis prior to the events in question was by no means dispositive of her claim that he sexually harassed her. *See Johnson v. West*, 218 F.3d 725, 729-30 (7th Cir. 2000); *Curry v. Dist. of Columbia*, 195 F.3d 654, 663 n.18 (D.C. Cir. 1999); *see also Pergine v. Penmark Mgmt. Co.*, 314 F. Supp. 2d 486, 491 (E.D. Pa. 2004) (collecting additional cases); *cf. Pipkins v. City of Temple Terrace, Fla.*, 267 F.3d 1197, 1201 (11th Cir. 2001). "'A person's private and consensual sexual activities do not constitute a waiver of his or her legal protections against unwelcome and unsolicited sexual harassment'" at work. *Winsor v. Hinckley Dodge, Inc.*, 79 F.3d 996, 1001 (10th Cir. 1996) (quoting *Katz v. Dole*, 709 F.2d 251, 254 n.3 (4th Cir. 1983)). An employer is obliged to deal reasonably with unlawful harassment in the workplace regardless of who perpetrates it. *Dunn v. Washington County Hosp.*, 429 F.3d 689, 691-92 (7th Cir. 2005). But the existence of a current or former social relationship between the harasser and the harassee can shed light on such relevant questions as whether the complained-of conduct was unwelcome, whether it resulted in a workplace that the harassee subjectively experienced as hostile, and whether it occurred because of the harassee's sex. *Pipkins*, 267 F.3d at 1200-01; *Curry*, 195 F.3d at 663 n.18; *Galloway v. General Motors Serv. Parts Operations*, 78 F.3d 1164, 1168 (7th Cir. 1996) (citing *Huebschen v. Dep't of Health & Social Servs.*, 716 F.2d 1167, 1172 (7th Cir. 1983)), *abrogated on other grounds by Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 122 S. Ct. 2061 (2002). Moreover, to the extent that Ammons-Lewis denied having dated or socialized with Davis, contrary evidence was relevant to an assessment of her credibility.

Of course, the district court had a duty under Federal Rule of Evidence 403 not to allow the dispute over the

nature of the relationship between Ammons-Lewis and Davis to obscure the actual issues in the case. But having reviewed the record, we are satisfied that the questioning (and subsequent argument of counsel) concerning the photo occupied a modest amount of trial time and did not pose a substantial risk of distracting the jury.

For that matter, we have a hard time believing that the photograph was harmful to Ammons-Lewis's case, as it lent little support to the notion that she and Davis had once been a couple: the two of them were photographed in a group with four other people, and they were not touching, looking at one another, or even standing next to one another in the photograph. *See* R. 148 Def. Ex. 74. Ammons-Lewis herself agreed that she and Davis had attended some of the same social gatherings outside of the workplace, so the photograph was as consistent with her position that she and Davis had not been romantically involved as it was with Davis's position that they had been.

As for the element of surprise, the district court evidently accepted the defense's representation that Davis had not discovered the photograph until the weekend before it was disclosed, and we are in no position to second-guess the court's assessment. To compensate for the eleventh-hour disclosure, the court gave Ammons-Lewis and her counsel the opportunity to review and discuss the photograph before she was questioned about it in the jury's presence, thus avoiding the prospect of an ambush. And of course, since Ammons-Lewis had posed for the photograph, she was as well-situated as Davis to recall the circumstances under which it was taken.

Finally, we add that to the extent that the photograph lent any support to the notion that Ammons-Lewis and Davis had once dated, it was by no means the sole or most

compelling evidence that pointed to a prior romantic relationship. In addition to Davis himself, three witnesses offered much more direct testimony to that effect. *See* R. 129-5 at 878-80 (Davis); R. 129-6 at 948-49 (Charles Jones); R. 129-7 at 1171-72 (Elnora Wilson-Simpson); R. 129-8 at 1344-45, 1347 (Keisha Guy). (Which will bring us to the next issue.) So any error in allowing the photograph was harmless.

C.   Failure to disclose full name of witness Keisha Guy

As we have noted, one of the incidents underlying Ammons-Lewis's hostile environment case was the alleged assault and battery by Davis, which Ammons-Lewis reported to the police. Chicago police officer Keisha Guy interviewed Ammons-Lewis regarding her complaint and documented the interview in a written report. Guy's report characterized Davis as "an ex-boyfriend of the victim" and indicated that the offense Ammons-Lewis had reported was "domestic related." R. 50-3 Ex. 17 at 1. Guy would later testify that she wrote her report in this way based on what Ammons-Lewis herself had told her. R. 129-8 at 1344-45, 1347. (Ammons-Lewis denied having told the police officer that Davis was her former boyfriend. R. 129-4 at 532.)

As we have noted, Ammons-Lewis sought unsuccessfully prior to trial to exclude evidence suggesting a prior romantic relationship between herself and Davis. R. 66. In its response to that motion, filed some six months prior to the commencement of the trial, the District disclosed that it would be calling as a witness "Officer K. Guy." R. 58 ¶ 3. The District stated its belief that Guy would testify that "Plaintiff made statements concerning a romantic relationship between Plaintiff and Willie Davis." *Id.* The District's final roster of anticipated witnesses, submitted as part of the final pre-trial order, listed the "Chicago

Police Officer who interviewed DAL on 12/12/01" as a potential witness, although it did not identify Guy by name. R. 140 App. 4, Def. Witness List at 2. Well in advance of trial, both parties were also in possession of Officer Guy's written report, which likewise identified her as "K. Guy" and included her star number. R. 50-3 Ex. 17. Ammons-Lewis herself submitted a copy of Guy's report as an exhibit in support of the additional statement of material facts she tendered with her memorandum in opposition to the District's motion for summary judgment. *Id.* Not until the first day of trial, however, did the District identify Officer Guy by her full name—that is, Keisha Guy. R. 129-2 at 46.

Ammons-Lewis claims to have been surprised by the disclosure of Guy's first name. Her recollection was that she had been interviewed by a male police officer. Thus, she was not expecting a female officer—i.e. Guy—to testify about the nature of the complaint she filed with the police over the incident with Davis. Ammons-Lewis appears to suggest that the District purposely kept Officer Guy's first name quiet until the start of trial in order to catch her by surprise.

This is a frivolous argument. In the first instance, Ammons-Lewis never voiced an objection when Guy's first name was identified or when Guy was summoned to the witness stand.[3] Nor could she plausibly have made such an

---

[3] Ammons-Lewis appears to rely on her pre-trial motion to exclude any insinuation of a romantic relationship between herself and Davis as sufficient to preserve her objection to Guy's testimony. Ammons-Lewis Br. 38 n.5. It was not. We may assume that the motion in limine preserved an objection to the substance of Guy's report and to Guy's testimony, insofar as both indicated that Davis was Ammons-Lewis's former boyfriend. But this is not the objection Ammons-Lewis makes here; she is

(continued...)

objection. Long before trial, Ammons-Lewis knew that Officer Guy had prepared a written report concerning her complaint against Davis. That report reflected Guy's first initial, last name, and star number. R. 50-3 Ex. 17. Ammons-Lewis herself relied on Guy's report in opposing the District's motion for summary judgment nearly a year before the trial commenced. *See id.* Six months before trial, when the District filed its opposition to her motion to exclude any evidence insinuating that she and Davis had dated, Ammons-Lewis knew that the District intended to call Guy to testify. R.58 ¶ 3. Based on the District's memorandum and Guy's report, Ammons-Lewis would have known that Guy was likely to testify that when she interviewed Ammons-Lewis, Ammons-Lewis had characterized Davis as her ex-boyfriend. *Id.* That neither the police report nor the District's memorandum disclosed Guy's first name did not prevent Ammons-Lewis from ascertaining her full name and gender in advance of trial. The information in Ammons-Lewis's possession was more than sufficient to enable her counsel to locate Guy and alert her to the need to do so.

Indeed, according to Guy's testimony, Ammons-Lewis herself tracked Guy down long before the trial began. Guy testified that Ammons-Lewis came to see her at the police station approximately one year before the trial and challenged Guy's report as inaccurate to the extent it indicated that she and Davis had had a domestic relationship. R. 129-8 at 1351-52. According to Guy, Ammons-

---

[3] (...continued)
objecting to Guy as a witness based on the District's failure to timely disclose Guy's complete name. Nothing in Ammons-Lewis's motion in limine professed any doubt or confusion about the identity of the police officer who interviewed her and completed the police report. Ammons-Lewis points to nowhere in the record where that particular objection was made.

Lewis seemed somewhat irritated, telling her that she had a sexual harassment suit against Davis and that Guy was "messing it up." *Id.* at 1353. If that testimony is credited, the belated disclosure of Guy's complete first name obviously came as no surprise to Ammons-Lewis at all. Even if Guy's testimony about the confrontation is ignored and we assume that neither Ammons-Lewis nor her counsel spoke with Guy in advance of trial, the fault in failing to ascertain Guy's identity can be laid only at Ammons-Lewis's doorstep.

D. Jury instructions as to Ammons-Lewis's harassment claims

Finally, Ammons-Lewis objects to the jury instructions that outlined what she needed to show in order to establish a hostile working environment and to render the District liable to her for the hostile environment. Ammons-Lewis asserted two related but distinct claims of harassment: the first based on alleged harassment by her co-workers, and the second based on harassment allegedly perpetrated by Stephen Kelly, whom she alleged constituted one of the District's supervisory employees. The claims were distinct in that the standard for employer liability differs depending on whether the perpetrator of the harassment was a co-worker or a supervisor. *See Erickson v. Wis. Dep't of Corrections*, 469 F.3d 600, 604 (7th Cir. 2006) ("The standard for supervisors is strict liability and the standard for coworkers is negligence.") (citations omitted); *Cerros v. Steel Tech's, Inc.*, 398 F.3d 944, 951-52 (7th Cir. 2005).

The instructions given to the jury acknowledged this distinction, but rather than giving the jury an entirely separate set of instructions for each of the two claims, the court first advised the jury of the elements, applicable to both claims, that Ammons-Lewis would have to meet

in order to establish actionable sexual harassment. Specifically, the jury was advised that Ammons-Lewis had to show by a preponderance of the evidence that (1) she was subjected to pornography, sexually-oriented drawings, sexually-oriented verbal comments, and physical contact that had a sexual character or purpose, (2) this conduct was unwelcome, (3) the conduct occurred because Ammons-Lewis was a woman, (4) Ammons-Lewis believed that the conduct rendered her work environment hostile or abusive, and (5) the conduct was sufficiently severe or pervasive that a reasonable person in her position likewise would have found the workplace hostile or abusive. R. 96 at 19-20. The instruction admonished the jury to consider the conduct of Ammons-Lewis's supervisors as well as her co-workers in deciding whether she had met these elements. *Id.* at 19. In the event the jury determined that Ammons-Lewis had not met all five of the elements outlined, it was instructed to render a verdict in favor of the District on both of her claims. *Id.* at 20. If, on the other hand, it found that she had met each of the five elements of a hostile environment, the jury was advised to proceed onward and consider whether the District was liable to Ammons-Lewis for the acts of sexual harassment she had alleged. *Id.*

When it instructed the jury on the rules governing employer liability, the court alerted the jury to the distinction between liability based on the acts of co-workers and liability based on the acts of supervisors. "An employer's liability for a sexually hostile work environment depends on whether the person(s) who did the acts that created the hostile work environment were co-workers or supervisors of the plaintiff. For this reason, I will give you separate instructions relating to conduct by co-workers and conduct by supervisors." *Id.* at 21. The court advised the jury that if Ammons-Lewis had shown that Kelly had supervisory authority over her, it should consult a separate instruction setting forth the standard for employer

liability based on the conduct of a supervisor. *Id.* at 21; *see id.* at 23-24. The jury was advised to consult a different instruction on liability for co-worker harassment in the event it determined that Kelly was not Ammons-Lewis's supervisor. *Id.* at 21; *see id.* at 22. That instruction set forth the standard for employer liability based on the conduct of one's co-workers. *Id.*

The jury was given a verdict form calling for separate verdicts as to Claim One (co-worker harassment) and Claim Two (harassment by Kelly). The portion of the form concerning Claim Two posed two inquiries to the jury. First, the jury was asked whether Kelly had supervisory responsibility over Ammons-Lewis. If the jury answered no to that inquiry, it was instructed to stop there. But if it answered yes to that question, it was told to indicate whether the District was liable for any harassment allegedly perpetrated by Kelly. *Id.* at 30.

The verdict form as completed by the jury at the conclusion of its deliberations reflected a verdict in favor of the District as to Claim One but no answer as to either of the questions regarding Claim Two. R. 129-10 at 1517, 1518. Without objection from the parties, the court admonished the jurors that they must determine whether Kelly was Ammons-Lewis's supervisor and report a finding in that regard; depending on their answer, they might then have to address the second question as well. *Id.* at 1519-20. The jury then retired to resume deliberations. Shortly thereafter, the jury sent a note to the court indicating that it had not answered Claim Two because it was under the impression that it need not do so if it concluded that Ammons-Lewis had not established the five elements of a hostile environment. *Id.* at 1525. At that point, the court instructed the jury that if indeed it had concluded that Ammons-Lewis had not proven conduct constituting sexual harassment, then it need not report a finding as to whether Kelly was her supervisor,

but it should indicate whether the District was liable to Ammons-Lewis based on Kelly's alleged conduct. *Id.* at 1526. If, however, its finding was that Ammons-Lewis had satisfied the five criteria for a hostile environment, then it must render and report a finding as to whether Kelly amounted to her supervisor. *Id.* The jury subsequently completed the verdict form by reporting a verdict in favor of the District on Claim Two. *Id.* at 1527.

Ammons-Lewis contends that the jury's initial failure to report a verdict as to Claim Two evidences the confusing and inadequate nature of the jury instructions. As we have mentioned, it is her contention on appeal that the instructions should have drawn a clearer line between the two claims, providing entirely separate sets of instructions as to each.

Ammons-Lewis did not object below to the form or content of the relevant jury instructions, but Federal Rule of Civil Procedure 51(d)(2) now allows for plain error review of the instructions; in that respect, it represents an exception to the general rule that plain error review is unavailable in civil cases. *See Schmitz v. Canadian Pacific Ry. Co.*, 454 F.3d 678, 684 n.3 (7th Cir. 2006); *Higbee v. Sentry Ins. Co.*, *supra*, 440 F.3d at 409. Generally, we review jury instructions to determine whether those instructions completely and accurately informed the jury of the relevant legal principles. *E.g.*, *Schmitz*, 454 F.3d at 681-82; *Knox v. Indiana*, 93 F.3d 1327, 1332 (7th Cir. 1996). In making that determination, we examine the instructions as a whole rather than in isolation from one another. *See id.*; *Byrd v. Ill. Dep't of Public Health*, 423 F.3d 696, 705 (7th Cir. 2005). We will reverse only if we are convinced that an inaccuracy or omission in the instructions' statement of the law misled or confused the jury to the prejudice of the appellant. *Schmitz*, 454 F.3d at 682; *Byrd*, 423 F.3d at 705. When our review is for plain error,

as it is here, the standard is obviously higher. Plain error demands a showing not only that an error occurred which, in retrospect, is obvious, but also that the error, among other things, affected the substantial rights of the appellant. Rule 51(d)(2); *see generally Johnson v. United States*, 520 U.S. 461, 466-67, 117 S. Ct. 1544, 1548-49 (1997); *see also Higbee*, 440 F.3d at 409.

We find no plain error in the jury instructions warranting relief. Although the jury evidenced some confusion in completing the verdict form, the likely source of the confusion lay in the form itself rather than the jury instructions. The instructions reflected a true and complete summary of the relevant law, recognized the distinction between employer liability for the conduct of co-workers and liability for the conduct of supervisors, and gave the jury an accurate roadmap to follow in applying the law to the two different claims. The note that the jury sent to the court explaining that it did not believe it needed to assess Kelly's status as a supervisor or co-worker in the event it determined that Ammons-Lewis had not presented sufficient proof of actionable sexual harassment suggests that the jury understood the court's instructions correctly and simply did not realize it was obliged to report a verdict as to Claim Two even if it believed that sexual harassment had not been proven. The court took appropriate action—to which Ammons-Lewis did not object—to correct the jury's misunderstanding on this score. We have no reason to believe that the jury's verdict as to either of the two sexual harassment claims was the product of confusion or a misunderstanding of the law.

## III.

For the reasons discussed herein, we AFFIRM the jury's verdict in favor of the District as to Ammons-Lewis's Title VII claims of sexual harassment, and the court's subse-

quent entry of judgment in favor of the District on her parallel section 1983 claims.

A true Copy:

Teste:

_____

*Clerk of the United States Court of*
*Appeals for the Seventh Circuit*