In the

# United States Court of Appeals
## For the Seventh Circuit

No. 05-1277

LISA DUNN,

*Plaintiff-Appellant,*

*v.*

WASHINGTON COUNTY HOSPITAL
and THOMAS J. COY,

*Defendants-Appellees.*

Appeal from the United States District Court
for the Southern District of Illinois.
No. 03-262—**William D. Stiehl**, *Judge.*

ARGUED SEPTEMBER 14, 2005—DECIDED NOVEMBER 17, 2005

Before EASTERBROOK, ROVNER, and SYKES, *Circuit Judges.*

EASTERBROOK, *Circuit Judge.* For several years, Lisa Dunn worked as a nurse at Washington County Hospital in Nashville, Illinois. It is a small hospital, with only 59 beds, so members of the staff must be able to work well together; antagonists cannot be separated readily. Dunn contends in this suit under Title VII of the Civil Rights Act of 1964 (and other federal statutes) that Thomas J. Coy, the head of obstetric and emergency services, made life miserable for her and other women on the staff. Details do not matter for current purposes. The district court assumed that Dunn encountered discriminatory working conditions (men on the staff faced no similar problems) but granted summary

judgment for the Hospital anyway, because at the time Dr. Coy was not one of the Hospital's employees. He had staff privileges, which he used to furnish medical services directly to patients. The Hospital therefore could not control his conduct, the judge ruled, and could not be liable for it.

The district judge proceeded as if this were a tort suit. Coy was an independent contractor; the Hospital would not be liable on principles of *respondeat superior* for intentional torts he committed against the nurses; consequently, the judge thought, the Hospital could not be liable under Title VII either. The proposition about the limits of vicarious liability is incontestable. See *Berry v. Delta Airlines, Inc.*, 260 F.3d 803, 811-12 (7th Cir. 2001). It is also irrelevant, because liability under Title VII is direct rather than derivative.

The Supreme Court held in *Burlington Industries, Inc. v. Ellerth*, 524 U.S. 742 (1998), and *Faragher v. Boca Raton*, 524 U.S. 775 (1998), that an employer is answerable under Title VII only for "its own" deeds—and this is so even if the person who takes supposedly discriminatory action is on its payroll. An employer is responsible for every "tangible employment action" (hiring, firing, promotion or its absence, wage-setting, and the like) plus any other discriminatory term or condition of employment that the employer fails to take reasonable care to prevent or redress.

When a supervisor causes the objectionable conduct, proof of reasonable care (and reasonable complaint by the employee) is an affirmative defense; otherwise the plaintiff bears the burden of showing that the employer knew of the problem (usually though not always this requires the employee to show that a complaint was made) and that the employer did not act reasonably to equalize working conditions once it had knowledge. See, e.g., *Faragher*, 524 U.S. at 799-808; *EEOC v. Indiana Bell Telephone Co.*, 256 F.3d 516, 524-26 (7th Cir. 2001) (en

banc); *Shafer v. Kal Kan Foods, Inc.*, 417 F.3d 663 (7th Cir. 2005); *Hostetler v. Quality Dining, Inc.*, 218 F.3d 798, 809-11 (7th Cir. 2000).

Because liability is direct rather than derivative, it makes no difference whether the person whose acts are complained of is an employee, an independent contractor, or for that matter a customer. Ability to "control" the actor plays no role. Employees are not puppets on strings; employers have an arsenal of incentives and sanctions (including discharge) that can be applied to affect conduct. It is the use (or failure to use) these options that makes an employer responsible—and in this respect independent contractors are no different from employees. Indeed, it makes no difference whether the actor is human. Suppose a patient kept a macaw in his room, that the bird bit and scratched women but not men, and that the Hospital did nothing. The Hospital would be responsible for the decision to expose women to the working conditions affected by the macaw, even though the bird (a) was not an employee, and (b) could not be controlled by reasoning or sanctions. It would be the Hospital's responsibility to protect its female employees by excluding the offending bird from its premises. This is, by the way, the norm of direct liability in private law as well: a person "can be subject to liability for harm resulting from his conduct if he is negligent or reckless in permitting, or failing to prevent, negligent or other tortious conduct by persons, whether or not his servants or agents, upon premises or with instrumentalities under his control." *Restatement (2d) of Agency* §213(d).

Just so with an offending independent contractor, as Coy is alleged to be. The employer's responsibility is to provide its employees with nondiscriminatory working conditions. The genesis of inequality matters not; what *does* matter is how the employer handles the problem. Accord, *Lockard v. Pizza Hut, Inc.*, 162 F.3d 1062, 1072-74 (10th Cir. 1998) (collecting cases). Dunn alleges that the Hospital

knew that Coy made life miserable for women (but not men) and did nothing in response. That states a claim of sex discrimination under Title VII. The Hospital is mistaken in saying that Dunn failed to plead the correct theory (or the right facts) in the district court: Pleadings need not contain either factual details or legal theories. See *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506 (2002); *Bartholet v. Reishauer A.G. (Zürich)*, 953 F.2d 1073 (7th Cir. 1992). Nor does it matter whether Coy intended to injure women; the right question is whether the Hospital intentionally created or tolerated unequal working conditions. The district court therefore must decide on remand whether Coy's conduct was severe enough (and the Hospital's response feeble enough) to justify liability, and if material facts are in dispute a trial must be held.

Dunn's other contentions, however, do not require additional proceedings. Coy was not a state actor, so claims under the first amendment fail. Dunn's equal-protection argument—that the Hospital favored Coy over her because he brought in more business—does not show intentional discrimination against women. Dunn's own characterization of events implies that the Hospital tolerated Coy despite, rather than because of, his puerile behavior, and thus did not intentionally discriminate. See *Personnel Administrator of Massachusetts v. Feeney*, 442 U.S. 256, 279 (1979) ("Discriminatory purpose . . . implies more than intent as volition or intent as awareness of consequences. It implies that the decisionmaker . . . selected or reaffirmed a particular course of action at least in part because of, not merely in spite of, its adverse effects upon an identifiable group.") (internal footnote, citation, and quotation marks omitted). Dunn does not contend that the Hospital acted as it did because it shared Coy's prejudices.

Public employers must avoid sex discrimination in their own acts (including the acts of their employees) but are not obliged to root out discrimination by private ac-

tors—and, as an independent contractor, Coy was a private actor. If the Hospital protected men but not women from depredations by third parties, it would transgress the original sense of equal protection, but Dunn does not contend that the Hospital protected *anyone* from Coy. The Constitution by and large establishes negative liberties; it does not require the state to prevent or redress the misconduct of private actors. See, e.g., *DeShaney v. Winnebago County Department of Social Services*, 489 U.S. 189 (1989); *Leeke v. Timmerman*, 454 U.S. 83 (1981). This is an important respect in which Title VII provides public employees with rights in addition to the Constitution's requirements.

Dunn's contention that the Hospital retaliated against her for complaining about Coy's misconduct is doubly incorrect: first because "the Hospital" did nothing at all (Coy is responsible for all of the supposedly retaliatory acts), and second because what Coy did would not create a legal problem even if imputed to the Hospital.

Almost all of what Dunn characterizes as "retaliation" is verbal requests from Coy to withdraw her complaint of sexual harassment. We assume (as we must at this juncture) that Coy spoke in a nasty and uncivil tone. "[P]aybacks are hell," one of his statements to Dunn, implied that he would do what he could to impede her career. Yet his statements did not cause Dunn any injury (that is to say, no adverse employment action occurred). See *Hottenroth v. Slinger*, 388 F.3d 1015, 1030 (7th Cir. 2004) ("It is well established that unfulfilled threats that result in no material harm cannot be considered an adverse employment action under Title VII."). Talk is cheap; unless Dunn knew that Coy had sabotaged the career of other nurses, his statements would not have dissuaded reasonable persons from protecting their own rights under the statute and thus cannot violate Title VII. See *Washington v. Illinois Department of Revenue*, 420 F.3d 658, 661-62 (7th Cir. 2005). Dunn did not offer evidence that Coy had damaged other nurses'

careers; instead the record shows that she stood up to a windbag.

The one supposedly retaliatory act that cannot be characterized as cajolery or dark hints of future adverse employment action occurred during late April 2002 when Coy pushed Dunn against a cabinet in the coffee room and, while he had her pinned, tapped her on the cheek with a closed fist. Dunn complained to the Hospital's management on May 2 about this assault and battery (which implied the possibility of a more serious physical attack in the future), and she never came to work again, sending a letter of resignation on May 6.

Coy's assault and battery may be actionable under state tort law, but they cannot be imputed to the Hospital—not only because Coy was not its employee but also because Dunn did not give management time to respond. Only a variant of absolute liability would deem the Hospital responsible for Coy's misbehavior, and Title VII is not an absolute-liability regime. Trying to pin the label "constructive discharge" on Coy's threat of violence is unhelpful. One threat of this kind does not meet the standard of constructive discharge, see *Pennsylvania State Police v. Suders*, 542 U.S. 129, 141 (2004), and it would not matter if it did—for only employers can "discharge" workers, and Coy was not Dunn's employer.

A final comment about the proceedings that lie ahead. Some of the discovery rulings were shaped by the district court's view that the Hospital could not be responsible for the acts of a non-employee; these must be reexamined on remand. For his part, Coy contends that much of the evidence that Dunn proposes to use is privileged under Illinois law, either because it concerns the relation between Coy and his patients or because it arises from a "peer review" proceeding (the process by which hospitals determine the suitability of physicians to serve on their medical

staffs). See 225 ILCS 60/45, 735 ILCS 5/8-2101. Coy does not explain, however, why these privileges matter to cases under the federal-question jurisdiction. Only in diversity litigation do state evidentiary privileges apply directly, see Fed. R. Evid. 501, and Coy does not contend that the privileges he asserts are recognized as a matter of federal common law. Cf. *University of Pennsylvania v. EEOC*, 493 U.S. 182 (1990). We need not decide whether they should be so recognized, as Coy failed to make these arguments in the district court and has forfeited them.

The judgment is affirmed to the extent that it concerns claims other than sex discrimination under Title VII. With respect to that claim the judgment is reversed, and the case is remanded for proceedings consistent with this opinion.

ROVNER, *Circuit Judge*, concurring in part and dissenting in part. I join the majority in reversing the entry of summary judgment in the Hospital's favor on Dunn's Title VII claim. My colleagues rightly recognize that Dr. Coy's alleged status as an independent contractor did not relieve the Hospital of its own obligation to provide employees with a nondiscriminatory workplace. If, as Dunn represents, the Hospital was on notice that Coy was sexually harassing her and other nurses and the Hospital did nothing to stop him, the Hospital can be held to account for its own negligence. My colleagues conclude that this is the sole claim on which the Hospital could be held liable. But I believe that the Hospital's alleged inaction could expose it to liability on two other claims: the Fourteenth Amendment equal protection claim and retaliation. I therefore dissent from the court's decision to affirm the entry of summary judgment on those two claims.

I begin with the Fourteenth Amendment claim. Because sexual harassment constitutes illegal gender discrimination for purposes of the Equal Protection Clause, *Bohen v. City of East Chicago, Ind.*, 799 F.2d 1180, 1185 (7th Cir. 1986), the Hospital as a state employer could be held liable for depriving Dunn of equal protection of the laws if its failure to effectively address Coy's alleged misconduct was intentional, *id.* at 1187. Dunn posits that the Hospital sat on its hands while Coy harassed her because Coy, as its principal surgeon, was worth much more to the Hospital in revenue than she or any other nurse. If so, my colleagues reason, the Hospital was not intentionally discriminating against women but rather guarding its own economic bottom line. *Ante* at 4. But one must take care to distinguish motive from intent. *See Johnson v. Phelan*, 69 F.3d 144, 155 (7th Cir. 1995) (Posner, J., concurring in part and dissenting in part) ("The distinction between motive and intent runs all through the law."). Discrimination is intentional if it is deliberate rather than accidental (i.e. negligent); and in the present context, where the state actor is charged with deliberately acceding to the discriminatory actions of a third party, it is beside the point whether the state actor itself was motivated by a class-based animus or some other reason. If a prominent surgeon told the Hospital, "I will come to work for you, but I insist that my nurses be white," the Hospital could not fire its African-American nurses and then evade equal protection liability by claiming that although the Hospital itself had nothing against people of color, the pressures of a competitive marketplace for surgeons left it no choice but to accede to the demands of a sought-after prospect. The Equal Protection Clause does not permit the State to yield to private prejudices. *See Palmore v. Sidoti*, 466 U.S. 429, 433, 104 S. Ct. 1879, 1882 (1984) ("The Constitution cannot control such biases but neither can it tolerate them. Private biases may be outside the reach of the law, but the law cannot, directly or indirectly, give them effect."); *City of Cleburne, Tex. v. Cleburne Living*

*Ctr.*, 473 U.S. 432, 448, 105 S. Ct. 3249, 3259 (1985) ("It is plain that the electorate as a whole, whether by referendum or otherwise, could not order city action violative of the Equal Protection Clause, and the City may not avoid the strictures of that Clause by deferring to the wishes or objections of some fraction of the body politic.") (citation omitted). If the facts are as Dunn describes them, the Hospital made a calculated decision not to stop Coy from harassing its female nurses because it did not wish to alienate a prized rainmaker. A jury could conclude that in so deciding, the Hospital intentionally subjected Dunn and its other female nurses to a patently discriminatory work environment. Whether it did so because its management did not like women or because Coy held an economic gun to its head is irrelevant. When the State ratifies the discriminatory acts of a private party, it is discriminating, period. *See United States v. Yonkers Bd. of Educ.*, 837 F.2d 1181, 1223-26 (2d Cir. 1987); *Smith v. Town of Clarkton, N.C.*, 682 F.2d 1055, 1066-67 (4th Cir. 1982); *Dailey v. City of Lawton, Okla.*, 425 F.2d 1037, 1039 (10th Cir. 1970).

*Personnel Administrator of Mass. v. Feeney*, 442 U.S. 256, 99 S. Ct. 2282 (1979), *see ante* at 4, is not to the contrary. *Feeney* dealt with a state statute that gave preference to veterans in hiring for the state's civil service jobs. The statute was challenged under the Equal Protection Clause as a form of gender discrimination. Facially, the statute made no distinction based on gender, but because the overwhelming majority of veterans were men, the preference had an undeniably adverse impact on female job applicants. Yet the Court held that this disparate impact, although it was the inevitable and foreseeable result of the veterans' preference, was not enough to establish that the State had acted with a discriminatory purpose in enacting the preference. *Id.* at 278-79, 99 S. Ct. at 2295-96. What was missing was proof that the State had enacted the preference "because of" rather than "in spite" of its adverse impact on women. *Id.* at 279; 99 S. Ct. at 2296.

This case, by contrast, charges a state actor with deliberately embracing a condition of employment that was, on its face, discriminatory. Coy was harassing only women, after all, and accepting as true Dunn's version of the facts, there could be no doubt that he did so because of sex. *See Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 80-81, 118 S. Ct. 998, 1002 (1998). For its part, the Hospital, by (allegedly) doing nothing to rein in Coy, ratified his conduct and perpetuated the hostile work environment of which Dunn and other nurses were complaining. The Equal Protection Clause would not permit the Hospital to inform its job applicants that women would be hired as nurses only if they agreed to submit to on-the-job sexual harassment. But that is, in effect, the very message that the Hospital allegedly sent to the female nurses who worked with Coy. The discrimination that these nurses claim to have experienced was not an incidental but a direct effect of the Hospital's decision to let Coy have his way with them. And if the facts are as Dunn claims them to be, one could reasonably conclude that the Hospital made that decision "because of" rather than "in spite of" its discriminatory effect—that it tolerated the harassment precisely because the freedom to sexually harass women was what Coy demanded (or the Hospital believed he demanded) as a condition of his contract with the Hospital. (It is entirely plausible that Coy was that important to the Hospital, given the dearth of talented surgeons in southern Illinois.)

Outsourcing has come into vogue at all levels of government as a means of cutting costs; but farming out public functions to private contractors does not relieve state or local governments of their Fourteenth Amendment obligation not to intentionally discriminate. Dunn does not seek to impose on the Hospital as a state actor a duty to root out discrimination by private persons nor does she seek to treat every action by Coy as the Hospital's own. *See ante* at 5. Rather, she seeks to hold the Hospital

liable for its own deliberate failure to intercede once it learned that Coy was discriminating against the Hospital's female employees. The State always has the ability to tell an independent contractor like Coy to stop discriminating or lose his contract. But if my colleagues are right, the State need never exercise that power; the State has a blank check to tolerate discrimination by its contractors so long as it does not share their prejudices. Indeed, under that narrow understanding of the Equal Protection Clause, state and local governments would be free to contract out public functions to firms that engage in all manner of discrimination that would be illegal if committed by governments agencies, so long as the governments themselves harbor no discriminatory animus. For example, a city would be free to award a trash collection contract to a scavenger firm that it knew would ignore African-American and Hispanic neighborhoods, on the ground that the firm offered the lowest price. If this is a correct understanding of the Equal Protection Clause, then its guarantee has very little meaning vis-à-vis the vast array of public functions that governments contract out to private firms.

As for the Title VII retaliation claim, the record permits the inference that after Dunn gave the Hospital a statement averring that Coy was sexually harassing her, the Hospital materially altered the terms of her employment in a way that would have dissuaded a reasonable worker in her position from making or supporting a charge of discrimination. *See Washington v. Illinois Dep't of Revenue*, 420 F.3d 658, 662 (7th Cir. 2005). Dunn's theory is that Coy, with the Hospital's full knowledge and acquiescence, embarked on a campaign to pressure her to retract her statement. That campaign was so unrelenting, lengthy, and ultimately threatening, Dunn alleges, that it amounted to a constructive discharge. My colleagues find two faults with Dunn's claim: (1) Coy is responsible for all of the allegedly retaliatory acts, whereas the Hospital itself did nothing, and (2)

Coy's acts, even if imputed to the Hospital, would not constitute legally cognizable retaliation. *Ante* at 5-6. With respect, these points do not give the evidence its due.

That the Hospital "did nothing at all" (*ante* at 5) is exactly why it might be liable for retaliation. It would be one thing if the Hospital were completely in the dark as to the actions Coy was taking against Dunn. But according to Dunn, throughout the nearly two-year period between her statement and her resignation, she complained repeatedly to her superiors that Coy was pressuring her to withdraw the statement, all to no avail. Indeed, Dunn alleges that just prior to her resignation, her supervisor remarked, "I see what's happening. I wish[ ] I could do something about it, but I can't. I understand that you are going to have to quit." 2002 Dunn Dep. at 31-32. Around the same time, Dunn told the Hospital's CEO that she was frightened by Coy's actions. "I'm scared, too," the CEO allegedly replied. R. 115 Ex. 8 ¶ 11; *see also* 2002 Dunn Dep. at 152-53. As with the Title VII discrimination claim, such allegations readily permit the inference that the Hospital knew what Coy was up to but made no effort to stop him; and as with that claim, the Hospital can be charged with its own failure to intervene.

Moreover, if the facts are as Dunn recounts them, it was the Hospital itself that put Dunn in this position. The relevant chain of events commenced in 2000 when another nurse, Jamie Jones, complained that Coy was sexually harassing her. The Hospital commissioned its attorney, Eric Trelz, to conduct an investigation into Jones' complaint. Trelz in turn spoke with a number of nurses, including Dunn; and either the Hospital's CEO or its Human Resources Director sat in on each of the interviews. At least six of the nurses, including Dunn, reported that Coy was sexually harassing them. Several of these nurses expressed concern about the possibility that Coy might retaliate against them if he were to learn of their statements. They

were promised that their statements would remain confidential unless and until the matter proceeded to court and the Hospital were compelled to produce the statements. It is a fair inference that Dunn and the other nurses relied on that promise in cooperating with the Hospital's investigation. The report that Trelz prepared at the conclusion of his investigation confirms that Dunn herself was worried about what might happen if Coy discovered what she said. "She is very concerned about her career with the Hospital and retaliation from Dr. Coy," the attorney wrote of Dunn. R. 115, Ex. 1 at 6. Despite the Hospital's awareness that the cooperating nurses were concerned about retaliation, and despite the assurances of confidentiality that the nurses had been given, Coy had copies of the nurses' statements in hand within weeks after the Trelz report was submitted to the Hospital's executive committee, and more than a year before Jones went to court on her charge. Coy would later testify that it was the chairman of that Hospital committee who gave him a copy of that report. A jury might conclude that the apparent breach of the Hospital's promise of confidentiality opened the door to the ensuing retaliation of which Dunn complains.

As for Coy's actions and whether they qualify as retaliation, I respectfully submit that to characterize them mostly as mere "verbal requests . . . [of Dunn] to withdraw her complaint of sexual harassment" (*ante* at 5) is to strip them of their tone and context. Coy's alleged actions against Dunn began with an invitation to apologize— "I can't believe you said what you said about me. I know you are sorry. I will accept your apology." (2002 Dunn Dep. at 27-28)—and went downhill from there. On one or more occasions, according to Dunn, Coy told her that he would not be responsible for his actions if she did not change her statement. 2004 Dunn Dep. at 256. On other occasions he told her, "If you're not nice to me, there is no telling what could happen." *Id.* at 252, 254-55. On yet

another occasion, he told Dunn that she would one day need a hysterectomy and that he would be happy to do it "because paybacks are hell." *Id.* at 251-52; *see also id.* at 147. These are but a few examples of the comments that Coy allegedly made to Dunn beginning in July 2000, following the release of the Trelz report, until Dunn's resignation in May 2002. A jury might infer that this was not a simple, civilized dialogue between Coy and Dunn as to the accuracy of her statement, but a pattern of bullying aimed at forcing Dunn to withdraw her accusations.

Dunn, by the way, was not the only one on the receiving end of Coy's alleged arm-twisting. When Nurse Nikki Jablonski resigned from the Hospital in February 2002, she cited the pressure that Coy had placed on her to change her own statement as a reason for quitting. Jablonski would later testify that she felt "cornered" when Coy approached her outside the presence of others. Jablonski Dep. at 117-18. Jablonski also advised the Hospital's Human Resources Director that Coy was pressuring yet another nurse, Kelly Hare, to change her statement as well. Indeed, the evidence suggests that Coy was making the rounds of all of the nurses who had given statements against him in the course of the Jones investigation. According to Dunn, Coy told her in April 2002, just a few weeks before she resigned, that everyone except Dunn and Hare had changed their stories and that Dunn needed to do the same. R. 115, Ex. 9.

Although inaction describes much of the Hospital's course of conduct during this time, it played a more direct role in an incident that took place at the end of Dunn's tenure. On April 12, 2002, several months after Jones had initiated litigation against Coy, the Hospital's CEO allegedly ordered Dunn into a meeting with Coy's attorney as well as the Hospital's own counsel. At that meeting, according to Dunn, Coy's attorney proceeded to interrogate her in a rude and belligerent tone about the statement she had given in the

course of the Hospital's investigation, suggesting that Dunn and the other nurses had conspired to tell a common story and that Dunn might have given the Hospital false information. Throughout the cross-examination, Dunn alleges, the Hospital's attorney sat silently by. Upset at how she was being treated, Dunn left the meeting. The Hospital's CEO, who witnessed her exit, testified that Dunn had "bolted." Newby Dep. at 109. According to Dunn, the pressure from Coy only increased after this meeting, with Coy ultimately going so far as to commit the assault that my colleagues have mentioned.

Faced with this evidence, a jury could reasonably determine that Coy would stop at nothing to convince Dunn to retract her statement. It could find that Coy's badgering rendered the workplace hostile to Dunn and the nurses who had implicated him—sufficiently hostile that two of these nurses (Jablonski and Dunn), seeing that complaining about Coy did them no good, decided to resign. It might find that the Hospital itself—by abandoning the promise of confidentiality and handing the nurses' statements over to Coy, by allegedly doing nothing about the pressure Coy was putting on these nurses to withdraw their allegations, and by summoning Dunn into a hostile debriefing by Coy's attorney—was deliberately letting Dunn and the other complainants twist in the wind, precisely as they had feared would happen. *See Washington*, 420 F.3d at 662 (noting the significance of an employee's known vulnerabilities to the retaliation analysis). This may not have been retaliation in the more blatant sense (being fired or demoted for speaking out against discrimination), but a jury could nonetheless decide that the Hospital materially altered the terms of Dunn's employment by letting Coy run amok after Dunn cooperated in the investigation in Jones' complaint. For although an isolated and unfulfilled threat of retribution may not amount to an adverse employment action, *see ante* at 5, a series of such threats, unchecked by the employer, can

give rise to a hostile work environment, *see Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 754, 118 S. Ct. 2257, 2265 (1998) (categorizing multiple unfulfilled threats by alleged harasser as a hostile environment claim), and a hostile work environment can be a form of retaliation. *Stutler v. Ill. Dep't of Corrections*, 263 F.3d 698, 703 (7th Cir. 2001); *see also Washington*, 420 F.3d at 662-63.

For these reasons, I would reverse the grant of summary judgment on Dunn's Equal Protection and retaliation claims and remand them to the district court for further proceedings.

A true Copy:

      Teste:

 

$\overline{\hspace{6cm}}$

*Clerk of the United States Court of Appeals for the Seventh Circuit*