RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 25a0214p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

───────────────

DOROTHY BIVENS,

                    *Plaintiff-Appellant*,

    *v.*

ZEP, INC.,

                    *Defendant-Appellee*.

No. 24-2109

───────────────

Appeal from the United States District Court for the Eastern District of Michigan at Detroit.
No. 2:23-cv-11398—Matthew F. Leitman, District Judge.

Decided and Filed:  August 8, 2025

Before:  THAPAR, NALBANDIAN, and READLER, Circuit Judges.

───────────────

## COUNSEL

**ON BRIEF:**  Carla D. Aikens, CARLA D. AIKENS, P.L.C., Detroit, Michigan, for Appellant. Elizabeth A. Malloy, COZEN O'CONNOR, Philadelphia, Pennsylvania, for Appellee.

───────────────

## OPINION

───────────────

CHAD A. READLER, Circuit Judge.  After being fired from her job as a sales representative, Dorothy Bivens sued her employer, Zep, Inc., asserting claims under Title VII and Michigan law.  According to Bivens, the company created a hostile work environment based on the actions of a company client.  And when she complained about the client's harassment, she adds, the company fired her in retaliation for those complaints.  Alternatively, she claims, Zep fired her because she is black.  The district court granted Zep summary judgment on all three claims.  We affirm.

I.

Zep, Inc. manufactures and distributes cleaning products to retail and commercial businesses throughout North America and Europe. The company hired Dorothy Bivens to work as a territory sales representative in the Detroit area. In that role, Bivens visited Zep's Detroit-area clients to sell products and maintain relationships.

A few months into her tenure, Bivens went to visit one of Zep's clients, a motel. When she stepped into the motel manager's office, the manager locked the door behind her. He then asked her if they could date. Bivens said no, explaining that she was married. Feeling uncomfortable, Bivens asked to leave. The manager unlocked his office door, and Bivens walked out. Bivens later described these events to her supervisor, Joshua Rain. Rain reassigned the client to another sales team, meaning Bivens would not need to interact with the client again. Neither Bivens nor Rain mentioned the incident to anyone else working at Zep.

Around the same time, Zep was looking to cut costs, largely due to the company's fluctuating success during the COVID-19 pandemic. Company president Bill Moody determined that Zep needed to reduce the company's headcount and identified several roles to eliminate, focusing on sales representatives serving small territories that were projected to generate less than $240,000 in annual revenue. In the end, Moody selected 23 roles to eliminate, including Bivens's, as her territory had a projected annual revenue of under $100,000. The decision was passed down the chain of command, with Rain informing Bivens of her termination.

Following her termination, Bivens sued Zep for hostile work environment harassment, retaliation, and discrimination, in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq., and the Elliott-Larsen Civil Rights Act, Mich. Comp. Laws § 37.2101 (1979). In her complaint, Bivens asserted that the client's actions subjected her to a hostile work environment and, further, that she was fired either because she complained about the client's advances or because she is black. At the close of written discovery, Bivens moved to compel Moody to bring certain documents to his deposition. The district court denied the motion. And after all discovery was completed, the district court granted Zep summary judgment on each of Bivens's claims. That ruling prompted an appeal by Bivens, which we turn to now.

II.

Familiar principles guide our review.  We consider the district court's grant of summary judgment to Zep with fresh eyes.  *Colson v. City of Alcoa*, 37 F.4th 1182, 1186 (6th Cir. 2022).  To prevail on summary judgment, the moving party—here, Zep—must demonstrate that no genuine issue of material fact exists and that it is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a).  Although we give the non-moving party—here, Bivens—the benefit of all reasonable factual inferences, she still must counter Zep's initial showing by identifying "significant probative evidence" on which the jury could reasonably find for her.  *Green Genie, Inc. v. City of Detroit*, 63 F.4th 521, 526 (6th Cir. 2023) (quotation omitted).  Put differently, summary judgment was proper if Bivens "fail[ed] to make a showing sufficient to establish the existence of an element essential to [her] case, and on which [she] [bore] the burden of proof at trial."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

A. We begin with Bivens's claims under Title VII, starting with her hostile work environment claim.  According to Bivens, she faced a hostile work environment because of the client's sexual harassment during a meeting in his office, for which Zep should be liable.

Title VII prohibits an employer from discriminating against an employee because of sex.  *See* 42 U.S.C. § 2000-2(a)(1).  The prohibition encompasses acts that create a sex-based hostile work environment.  *See Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 66 (1986).  To establish such a claim here, Bivens must show that (1) she was a member of a protected group who (2) faced unwelcome harassment, which (3) was based on her sex and (4) created a work environment that unreasonably interfered with her work performance, for which (5) Zep was responsible.  *Thornton v. Fed. Express Corp.*, 530 F.3d 451, 455 (6th Cir. 2008); *cf. Meritor Sav. Bank*, 477 U.S. at 63–69; *Faragher v. City of Boca Raton*, 524 U.S. 775, 786–93 (1998).

In dispute here is the fifth and final element, the corporate responsibility prong.  It addresses the reality that "employer[s]"—the proper object of Title VII's ban on discrimination—act through individuals.  *See* 42 U.S.C. §2000e-2(a)(1).  Generally, there are two ways that an employer can be held liable for the actions of individuals within its organization.

First, the employer may be held "directly" liable for its own official actions—that is, those taken by "officials" at such a high level within the organization that they are "treated as the organization's proxy." *Faragher*, 524 U.S. at 789–90. These include, for example, owners, partners, proprietors, corporate officers, and some high-level managers. *Id.* We treat these high-level officials as one-to-one stand-ins for the company itself. *Id.* So if one of them commits discrimination under Title VII, the company itself is automatically liable. *Id.*

The second path to liability deals with actors at lower levels of the organization. The actions taken by such employees are not considered the actions of the corporation itself, foreclosing the possibility of "direct" liability here. But in some circumstances, the employer nonetheless may be held "vicariously" liable for actions taken by its lower-level employees. *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 754–56 (1998). By and large, whether the company itself can be held liable in those instances depends on the nature of the actor's role within the company. *Id.* at 755.

But what if the harasser is employed by a company client, rather than the company itself? That is the unusual situation presented here. And it leads us to ask: When, if ever, is an employer liable—either directly or vicariously—for the harassment of an employee by a non-employee?

1. Start with the fact that, in passing Title VII, Congress created a federal species of intentional tort, "distinguish[ing]" claims under Title VII from torts based on mere "negligent or reckless" action. *Staub v. Proctor Hosp.*, 562 U.S. 411, 417 (2011). Consistent with that congressional design, the key "factual question" in a Title VII disparate treatment claim is whether "the defendant *intentionally* discriminated against the plaintiff." *Watson v. Fort Worth Bank & Tr.*, 487 U.S. 977, 986 (1988) (emphasis added). Accordingly, to prevail on a sexual harassment claim, including one based on a sexually hostile work environment, *see Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993), the threshold claim at issue here, a plaintiff must show "that the difference in treatment based on sex" was "intentional," *Bostock v. Clayton County*, 140 S. Ct. 1731, 1740 (2020). "Sexual harassment under Title VII," in other words, "presupposes intentional conduct." *Ellerth*, 524 U.S. at 756.

At first blush, then, Title VII would appear to impose liability for sexual harassment only when the employer itself "intentionally treats a person worse because of sex," *Bostock*, 140 S. Ct. at 1740, that is, when the employer "intend[s]" for sex-based harassment to be "the consequence[] of" its actions, *Staub*, 562 U.S. at 417 (emphasis omitted).   Yet in practice employers may be held liable for the intentional acts of their rank-and-file employees.   *E.g.*, *Faragher*, 524 U.S. at 789–91.   Why?   Because Title VII defines "employer" to include "any agent" of the company.   42 U.S.C. § 2000e(b).   In so doing, the law incorporates background agency law principles.   *Ellerth*, 524 U.S. at 755.   And consistent with those background principles, an employee counts as the employer's "agent" when he has agreed to "act" on the employer's "behalf" and "subject to [its] control."   Restatement (Second) of Agency § 1(1), (3) (A.L.I. 1958).   In that way, agency law allows for imputing wrongful intent up the chain of command, so to speak, from an intentionally harassing agent to the innocent, but still responsible, principal.   *Ellerth*, 524 U.S. at 755–56.   To summarize, then, the employer can be held liable either directly, for its own intentional actions, or vicariously, for those of its agent.

Under a simplistic application, these principles might suggest that an "employer" is vicariously liable under Title VII every time one of its "agent[s]" commits harassment.   42 U.S.C. § 2000e(b).   But that is not the case.   For just as background agency law principles give, they can also take.   *See Ellerth*, 524 U.S. at 755; *Faragher*, 524 U.S. at 791–92.   That brings into play important agency-law-based limiting principles on an employer's liability for employee-committed harassment.   *Ellerth*, 524 U.S. at 755.   In general, employers are liable for the torts that their employees commit within the scope of their employment—that is, "to further" the employer's "business."   *Id.* at 756.   But, as sexual harassment does not serve any business purpose, that tort falls outside the scope of employment.   *Id.*   And for torts of that type, agency law instructs, an employer is liable when the employee "was aided in accomplishing the tort by the existence of the agency relationship" or the employer "was negligent or reckless" in its own right in letting the employee commit the tort.   Restatement (Second) of Agency § 219(2) (A.L.I. 1958); *see Ellerth*, 524 U.S. at 758–60.

Beginning with the former "aided in the agency relation" standard, it encompasses instances where the harassing employee is a "supervisor" who takes a "tangible employment

action" against the victim.  *Ellerth*, 524 U.S. at 761–62.  That would be the case for a "significant change in employment status," such as "dock[ing] [her] pay" or "demot[ing]" her. *Id.* at 762.  In engaging in those acts, the supervisor's agency relationship with the employer necessarily "aided" the commission of sexual harassment, as the supervisor can dock pay or demote a fellow employee only pursuant to authority afforded him by his employer.  *Id.*  In that case, the supervisor's harassing intent is imputed to the employer, leading to strict corporate liability for supervisor harassment.  *Id.* at 765.  (As an aside, when a supervisor does not go as far as taking tangible employment action, whether the "aided in the agency relation standard" applies to his actions depends on the circumstances of the case.  *Id.* at 762–63.  An affirmative defense for employers may arise in such supervisor-harassment cases, the details of which do not matter here.  *Id.*)

The latter "negligence" standard, in turn, governs all other cases of coworker harassment—that is, all instances involving non-supervisors.  In that setting, agency law principles dictate that a harasser's unlawful intent may be imputed to the employer based only on the employer's negligence in allowing the harassment.  *Id.* at 758; *see also id.* at 759 (describing the negligence standard as the "minimum standard for employer liability under Title VII").  This notion of negligence-based liability for the intentional tort of a servant, the Restatement (Second) of Agency explains, is "an outgrowth of the idea that within the time of service, the master can exercise control over the physical activities *of the servant*."  Restatement (Second) of Agency § 219 cmt. a (A.L.I. 1958) (emphasis added).  But, it bears repeating, employer liability is imputed in this context only due to the agency relationship between the perpetrator (an employee) and the employer.  *Ellerth*, 524 U.S. at 758–59 (citing Restatement (Second) of Agency § 219(2) (A.L.I. 1958)).

This understanding plays a critical role here, as the client who harassed Bivens was not Zep's agent.  For their relationship to be deemed one of principal-agent, Zep (as the purported master) and the client (as the purported servant) each had to give their mutual "consent" to the notion that the client would "act" both "on [Zep's] behalf" and "subject to [its] control."  *See* Restatement (Second) of Agency § 1(1) (A.L.I. 1958).  There was no such agreement here. Rather, by all accounts, Zep merely acted as a supplier to the client, not as one who could

"exercise control over the [client's] physical activities." *Id.* § 219 cmt. a. As a result, we cannot rely on agency law to impute the client's wrongful intent to Zep. In other words, *Ellerth*'s agency-law-based negligence standard does not apply in these circumstances. *Ellerth*, 524 U.S. at 759. As then-Judge Barrett put it, "an employer is not *vicariously* liable for the sexual harassment of its employee by a customer." *EEOC v. Costco Wholesale Corp.*, 903 F.3d 618, 627 (7th Cir. 2018).

That leaves only one possibility for Bivens: holding Zep *directly* liable for its own actions. To assess the issue, we ask whether Zep itself "intentionally treat[ed]" Bivens "worse because of sex," *Bostock*, 140 S. Ct. at 1740—that is, whether the company intended for her harassment at the hands of the client to occur. Reflecting as much is Judge Easterbrook's opinion in *Dunn v. Washington County Hospital*, 429 F.3d 689, 691 (7th Cir. 2005), which agrees that intent is the proper standard in determining whether corporate liability arises directly from a non-employee's actions. In *Dunn*, a female hospital nurse sued her employer based on a staff physician's harassment. *Id.* at 690–91. The hospital responded that the doctor's status as an independent contractor categorically absolved it of any liability. *Id.* Disagreeing with the hospital, Judge Easterbrook noted that this argument would be relevant only in a claim for "derivative"—i.e., agency-based—liability, as opposed to "direct" liability. *Id.* at 691. But where an employee seeks to hold its employer liable for the employer's "own deeds" in allowing the harassment to occur, as in *Dunn*, "the right question is whether the [employer] *intentionally* created or tolerated unequal working conditions." *Id.* at 691–92 (emphasis added) (citation modified). In other words, it is the employer's intentional "decision to expose women to [discriminatory] working conditions" that would give rise to direct liability of the employer. *Id.* at 691.

In addition to laying out the correct intent standard, *Dunn* also provides a handy blueprint for how to apply it. "Intent," the Supreme Court has explained, is present when an actor "desires" an unlawful consequence from his actions or is "substantially certain" that it will result. *Staub*, 562 U.S. at 422 n.3 (citation modified); *see also* Restatement (Second) of Torts § 8A (A.L.I. 1965). That understanding was at the heart of Judge Easterbrook's conclusion in *Dunn* that the hospital was liable because it "knew that [the doctor] made life miserable for women

(but not men)" yet decided to "d[o] nothing in response." *Dunn*, 429 F.3d at 691.  Rephrased in tort-law terms, the hospital was "substantially certain" the harassment would keep happening if it continued to allow the physician staff privileges, but opted not to change course.  *Staub*, 562 U.S. at 422 n.3.

This same framework guides our analysis here.  As mentioned, with no legal bridge between the client's intent and Zep's responsibility, Zep can be held liable only for its *own* intentionaw actions.  Thus, for Bivens to hold her employer liable for hostile-work-environment harassment by a customer (or any other non-agent), she must show that Zep "intend[ed]" for the relevant unlawful "consequence"—here, her harassment—to occur.  *Staub*, 562 U.S. at 417 (emphasis omitted).  She can do so by providing evidence that Zep either "desire[d] to cause" her harassment or was "substantially certain" that it would "result from" its actions.  *Id.* at 422 n.3.

2.  Before applying this standard to Bivens's case, we note that our holding departs from the conclusion reached by most circuit courts to have addressed the issue as well as the EEOC's reading of Title VII.  Start with the agency, which deems negligence enough to hold an employer directly liable for workplace harassment committed by a non-employee.  29 C.F.R. § 1604.11(e) (allowing liability for non-employee harassment when the employer "knows or *should have known* of the conduct and fails to take immediate and appropriate corrective action" (emphasis added)).  Properly understood, the EEOC's interpretive authority over Title VII has limited reach, with the agency authorized to issue only "procedural regulations" setting forth the steps for pursuing a claim under Title VII, not substantive ones interpreting the statutory rights of parties.  42 U.S.C. § 2000e-12(a); *see also* 29 C.F.R. § 1604 (citing only § 2000e-12 as "authority" for its promulgation); *Young v. United Parcel Serv.*, 575 U.S. 206, 224–25 (2015); *Rabidue v. Osceola Refin. Co.*, 805 F.2d 611, 619 n.4 (6th Cir. 1986), *abrogated on other grounds by Harris*, 510 U.S. 17.  Thus, EEOC interpretive guidelines—like § 1604.11(e)—have no "controlling" effect on courts.  *Meritor Sav. Bank*, 477 U.S. at 65; *see also Rabidue*, 805 F.3d at 619 n.4 ("The EEOC guidelines are . . . not binding upon courts . . . ."); *cf. Waskul v. Washtenaw Cnty Cmty. Mental Health*, 979 F.3d 426, 469 (6th Cir. 2020) (Readler, J., concurring in part and dissenting in part) (critiquing use of guidance documents in general).  Indeed, even if the agency had express authority to interpret Title VII's substantive provisions,

we would still be obliged, "as always," to "independently interpret the statute." *Loper Bright Enters. v. Raimondo*, 144 S. Ct. 2244, 2263 (2024).

In either case, our respect for the agency's interpretation extends at most only so far as we find that reading "persua[sive]." *Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1944); *see also Loper Bright*, 144 S. Ct. at 2262; Brief of the Chamber of Commerce of the United States as Amicus Curiae in Support of Neither Party at 7–8, *Lesko v. United States*, 130 F.4th 1385 (Fed. Cir. 2025) (No. 23-1823), 2025 U.S. Fed. Cir. Briefs LEXIS 822 (noting, in brief authored by Professor Christopher Walker, that *Loper Bright* was "careful to frame *Skidmore* as a form of 'respect' based on the agency's power to persuade" rather than deference to the agency); *cf. Dayton Power & Light Co. v. Fed. Energy Regul. Comm'n*, 126 F.4th 1107, 1135 (6th Cir. 2025) (Nalbandian, J., concurring) (describing "*Skidmore* deference" as a "misnomer" because courts do not "yield[]" or "submit[]" to the agency's views, but only accord them "respect"); *Mayfield v. U.S. Dep't of Lab.*, 117 F.4th 611, 619 (5th Cir. 2024) (querying "what work *Skidmore* deference can do" after *Loper Bright* given that only the "best" interpretation is "permissible" regardless of the agency's view). Here, we do not. Having interpreted Title VII ourselves, we conclude, unlike the EEOC, that it imposes liability for non-employee harassment only where the employer intends for the harassment to occur.

Nor do we lose any sleep over standing nearly alone in this conclusion. Other than the Seventh Circuit, every other circuit to reach the issue, by our count the First, Second, Eighth, Ninth, Tenth, and Eleventh Circuits, has "applied" some form of "a negligence theory of liability to the harassing acts of customers." *Lockard v. Pizza Hut, Inc.*, 162 F.3d 1062, 1074 (10th Cir. 1998); *see also Rodriguez-Hernandez v. Miranda-Velez*, 132 F.3d 848, 854 (1st Cir. 1998); *Summa v. Hofstra Univ.*, 708 F.3d 115, 124 (2d Cir. 2013); *Crist v. Focus Homes, Inc.*, 122 F.3d 1107, 1108 (8th Cir. 1997); *Folkerson v. Circus Circus Enters., Inc.*, 107 F.3d 754, 756 (9th Cir. 1997); *Watson v. Blue Circle, Inc.*, 324 F.3d 1252, 1259 (11th Cir. 2003). The Seventh Circuit, it also bears noting, seems to have some intra-circuit tension on the issue, with Judge Easterbrook correctly identifying the need for "intentional[]" action by the employer, *Dunn*, 429 F.3d at 691–92, but other cases holding employers liable for "negligen[ce] either in discovering or remedying the harassment" by a non-employee, *e.g.*, *Nischan v. Stratosphere Quality, LLC*,

865 F.3d 922, 931 (7th Cir. 2017). In doing so, those panels, as well as our other sister courts, seem to have "follow[ed] the EEOC's guidelines on th[is] issue" without undertaking an independent evaluation of the statute. *Lockard*, 162 F.3d at 1073; *see also, e.g.*, *Summa*, 708 F.3d at 124 (relying on EEOC interpretation); *Crist*, 122 F.3d at 1110 (same); *Nischan*, 865 F.3d at 931 (relying on analogous Illinois statute). And in instances where these courts employ their own reasoning, it often seems like judicial policymaking, *e.g.*, *Crist*, 122 F.3d at 1110 (adopting the EEOC guidelines because they "strike a balance between . . . two extremes"), or fails to appreciate the role of agency law in this context, *e.g.*, *Folkerson*, 107 F.3d at 755–56 (jumping from liability for actions of "supervisors" and "management-level employees" to liability for actions of "private individuals" without discussing agency law principles).

*Lockard* provides a good example of the latter. The Tenth Circuit's justification for adopting a negligence standard in this context was tied to its belief that "harassment by customers is more analogous to harassment by co-workers than by supervisors." *Lockard*, 162 F.3d at 1074. Accordingly, it made sense to the panel to treat customer-harassment cases like "cases involving harassment by co-workers," which, again, utilize the negligence standard. *Id.* at 1074 (citing, *inter alia*, *Ellerth*, 524 U.S. at 759). As a matter of agency law, this analysis has its warts. True, coworkers and supervisors have their differences, with supervisors, unlike coworkers, frequently "aided . . . by the existence of the agency relation" in committing their torts. *Ellerth*, 524 U.S. at 760, 762–63. But supervisors and coworkers share an important trait, for purposes of the legal analysis here: both are agents of the employer, meaning their intent may be imputed to the employer through agency law. *See id.* at 758–62; Restatement (Second) of Agency §§ 1(1), 219 (A.L.I. 1958). But customers, on the other hand, who rarely agree to act on the corporate proprietor's "behalf" and "subject to [its] control," are not agents of that company. Restatement (Second) of Agency §§ 1(1) (A.L.I. 1958). For that reason, it follows, agency law does not treat "harassment by customers" as "analogous" to "harassment by co-workers," contrary to the Tenth Circuit's conclusion. *Lockard*, 162 F.3d at 1074. In the end, there is no legal mechanism for imputing unlawful intent of a customer to a business he frequents.

As an aside, it bears noting that many of the circuit cases that nominally apply a negligence standard would likely have been resolved the same way under the intent standard we adopt. In *Rodriguez-Hernandez*, for instance, the company instructed the "young, attractive women" it hired to be "especially cordial" to a certain client, and "keep him satisfied." 132 F.3d at 851–52. On such a record, a jury could fairly find that the company either "desired" the client's harassment of the company's female employees that inevitably occurred or was at least "substantially certain" that harassment would result from its actions—either of which would amount to tortious intent. *Staub*, 562 U.S. at 422 n.3. Likewise, in *Crist*, management chose to do nothing despite knowing that a mentally ill patient was repeatedly grabbing nurses in a sexual manner. *Crist*, 122 F.3d at 1108–10. That is, as in *Dunn*, the hospital continued to require female nurses to work with the patient even though it was "substantially certain" that choice would result in further harassment. *Staub*, 562 U.S. at 422 n.3; *cf. Dunn*, 429 F.3d at 691. Worse still, in *Crist*, a hospital administrator eventually asked one of the nurses to intentionally let the patient grab her in the presence of company executives so that the executives could observe and evaluate the risk he posed, *Crist*, 122 F.3d at 1110, easily demonstrating an affirmative "desire[]" for that incident of harassment to occur, *Staub*, 562 U.S. at 422 n.3.

3.a. Applying the intent standard for Title VII liability to the facts of Bivens's case, we look first to the incident of alleged harassment, which, as the district court described things, went as follows. A client asked Bivens to meet him at the client's office (ostensibly to discuss a sale). Bivens arrived and entered the office. The client then locked the door, started staring at Bivens, and asked (seemingly twice) if the two could date. The encounter ended when Bivens refused the client's invitation.

None of this would allow a jury to conclude that Zep "desired" such an interaction to occur or was "substantially certain" that it would. *Staub*, 562 U.S. at 422 n.3. Indeed, Zep is entirely absent from the timeline of this one-off event, even on Bivens's telling, until after she returned from the unfortunate sales call and reported it to her supervisor. Given as much, no jury could find that the company violated Title VII by "intentionally treat[ing]" Bivens "worse based on sex." *Bostock*, 140 S. Ct. at 1740.

b. We reach the same conclusion as to Bivens's state law claims pursued under the Elliott-Larsen Civil Rights Act, Mich. Comp. Laws § 37.2101 (1979). Neither party challenges the district court's holding that the federal and state claims rise and fall together, *Bivens v. Zep, Inc.*, No. 23-cv-11398, 2024 WL 4874212, at *3–8 (E.D. Mich. Nov. 22, 2024), likely because Michigan courts use the federal Title VII framework to assess state law equivalents, *Rouch World, LLC v. Dep't of C.R.*, 987 N.W.2d 501, 507 (Mich. 2022) ("encourag[ing]" Michigan courts to use "federal precedent" under Title VII "as guidance" in "interpreting the" ELCRA). So just as Bivens's hostile work environment claim fails under federal law, it fails under state law as well.

That is all the truer when one considers that the Michigan precedent we have uncovered similarly aims to apply the same agency law principles that undergird our holding under Title VII. Indeed, the Wolverine State explicitly labels the final element of a sexual harassment claim as "respondeat superior," the Latin phrase for "holding an employer or principal liable for the employee's or agent's wrongful acts," *Respondeat superior*, Black's Law Dictionary (12th ed. 2024), and, in turn, relies on "common-law agency principles" in determining "the extent of the employer's vicarious liability when harassment is committed by an agent." *Chambers v. Trettco, Inc.*, 614 N.W.2d 910, 915 (Mich. 2000). The ultimate inquiry thus remains "whether it can be fairly said that the employer committed the violation—either directly or through an agent." *Id.* at 916. In cases not involving an agent, it follows, Michigan courts look for proof that the employer "directly" committed harassment. *Id.* And there too, it is the employer's intentional harassment that counts.

*Chambers*, 614 N.W.2d 910, and *Elezovic v. Ford Motor Co.*, 697 N.W.2d 851 (Mich. 2005), do not say otherwise. While each case ultimately applied a negligence standard, it did so while showing proper care for agency law because the harasser at issue was a coworker, not a third party. *Chambers*, 614 N.W.2d at 912–13; *Elezovic*, 697 N.W.2d at 853–54. Had those courts faced an instance like this one involving non-employee harassment, we expect they would have correctly applied agency law to determine that direct employer liability requires intent.

B. Consider next Bivens's claim that the company retaliated against her by terminating her after she reported the incident of harassment. Before examining the claim's merits, we note

that Bivens likely forfeited her retaliation argument on appeal by giving the issue "perfunctory" treatment in her opening brief. *Buetenmiller v. Macomb Cnty. Jail*, 53 F.4th 939, 947 (6th Cir. 2022). An "appellant's brief," it bears reminding, "must contain . . . citations to the authorities . . . on which the appellant relies." Fed. R. App. P. 28(a)(8)(A). Yet Bivens's briefing on this front disregards Rule 28's "unambiguously mandatory" requirements by failing to cite a single legal authority. *Barrett v. Detroit Headings, LLC*, 311 F. App'x 779, 796 (6th Cir. 2009). This fact alone gives us ample reason to affirm. *United States v. Calvetti*, 836 F.3d 654, 664 (6th Cir. 2016); *United States v. Coleman*, 709 F. App'x 802, 806 (6th Cir. 2017) (finding an issue forfeited because the appellant did not "cite any legal authority for his contentions").

Still, we need not rely on preservation issues, because Bivens's retaliation claim fails on the merits. To survive summary judgment, Bivens needed evidence that (1) she engaged in protected activity under Title VII, (2) Zep knew it, (3) she suffered an adverse employment action, and (4) her protected activity caused the action. *Redlin v. Grosse Pointe Pub. Sch. Sys.*, 921 F.3d 599, 613 (6th Cir. 2019). The second element—Zep's knowledge—is dispositive here, because Bivens cannot show that "her protected activity"—complaining about a customer who sexually harassed her—"was known to those who made th[e] decision" to lay her off as part of the reduction-in-force. *Fenton v. HiSAN, Inc.*, 174 F.3d 827, 832 (6th Cir. 1999).

As the record reflects, the decision to eliminate Bivens's sales territory was made by "just Bill Moody," the company's president and CEO. Nicodemus Dep., R. 21-4, PageID 220 (citation modified). And Moody explained that he "didn't even know who Ms. Bivens was until" she sued the company—long after the workforce-reduction decision was final. Moody Dep., R. 21-5, PageID 249. Bivens, for her part, "failed to produce any direct or circumstantial evidence from which a reasonable jury could infer that" Moody "knew or w[as] aware of" her protected activity, dooming her retaliation claim. *Mulhall v. Ashcroft*, 287 F.3d 543, 551 (6th Cir. 2002) (emphasis omitted). As a result, her Title VII retaliation claim fails, as does her parallel Michigan law claim. *See Rouch World*, 987 N.W.2d at 507.

Disagreeing with that assessment, Bivens responds that certain "HR business partner[s]" who were aware of her sexual harassment complaint collaborated in Moody's decision to remove

her territory.  Br. Appellant 9–10.  But Bivens, recall, needs to link her allegation of an improper motive for her termination with the company officials who made that decision.  *Fenton*, 174 F.3d at 832.  And she does not point to any "significant probative evidence" that these HR officials took part in deciding to include her in the reduction-in-force.  *Green Genie*, 63 F.4th at 526. True, HR vice president Sheila Nicodemus testified that "the HR partner work[ed] with" the "executive leader of [a] department" to *implement* the reduction-in-force.  Nicodemus Dep., R. 24-3, PageID 332.  But their collaboration took place only "once the executive team"—that is, Moody—had already "set[] out the plan for the[] department."  *Id.*  Moody confirmed as much, testifying that "[o]nce I put a plan together on what we are going to do—[workforce reductions] included—*then* I would go to HR."  Moody Dep., R. 21-5, PageID 250 (emphasis added).

Even if the unnamed HR officials played some role in selecting Bivens's territory, Bivens has not shown that those officials knew about her complaint.  Bivens conceded that she did not report her harassment to anyone but Rain, her direct report.  And Rain, for his part, "considered the matter resolved" once he reassigned the harassing customer and, accordingly, "did not escalate the issue to Zep's Human Resources team."  Decl. Rain, R. 21-2, PageID 156.  We acknowledge, as Bivens emphasizes, Nicodemus's testimony to the effect that "complaints of sexual harassment would typically move up the chain of command."  Br. Appellant. 10.  But this general observation about what "typically" happens cannot create a genuine dispute of fact when countered with Rain's unrebutted declaration about what actually happened in this case.  And, in any event, Nicodemus's full testimony paints a different picture.  Complaints "would be expected to" be referred up the chain of command, she stated, "unless . . . it's an external situation that [the employee] could be removed from, and the employee's okay with that," in which case "there really wouldn't be a need to move it up the chain."  Nicodemus Dep. R. 24-3, PageID 348.  That seemingly describes Bivens's complaint to a tee, undermining any suggestion that the unnamed HR officials knew about her complaint, even if they did play a role in identifying her territory as a target for elimination.

C. Summary judgment was also appropriate as to Bivens's claim of racial discrimination, under both Title VII and Michigan law.  Because she was terminated in conjunction with a workforce reduction, Bivens had to supplement her ordinary prima facie showing of

discrimination with "additional direct, circumstantial, or statistical evidence tending to indicate that [Zep] singled [her] out . . . for discharge" because of her race. *Geiger v. Tower Auto.*, 579 F.3d 614, 622–23 (6th Cir. 2009) (quoting *Barnes v. GenCorp*, 896 F.2d 1457, 1465 (6th Cir. 1990)). Bivens offered three purported pieces of additional evidence. None allows her claim to survive summary judgment.

First, Bivens asserts that the racial composition of the employees chosen for termination suggests that race motivated those determinations. But the data cited by Bivens points the opposite way: she admits that 19 of the 23 employees terminated were white. This fact alone belies any notion that the workforce reduction was a means to single out black employees.

Nor do the terminated employees' supposed disciplinary records say otherwise. According to Bivens, nine of the terminated white employees had performance or disciplinary issues, while none of the terminated minority employees did. This argument faces considerable procedural hurdles. One, Bivens did not raise it before the district court. *See* Pl.'s Resp. Opp. Def.'s Mot. Summ. J., R. 23, PageID 277–81; *Joseph Forrester Trucking v. Dir., OWCP*, 987 F.3d 581, 593 (6th Cir. 2021) (noting forfeiture of arguments not raised below). And two, her appellate brief gives the argument "perfunctory" treatment, *Buetenmiller*, 53 F.4th at 946, supporting her claim with a single record citation that does not identify the race of the listed employees, Decl. Nicodemus, Ex. A, R. 21-6, PageID 259. Yet it is Bivens's job to connect the dots for us, rather than leaving them at best scattered throughout the record.

On top of these flaws, Bivens's evidence is weak on the merits. She cites a document showing an array of reasons for the various employees' termination, with a common justification being "small territory." *Id.* (citation modified). Bivens finds it significant that all four of the terminated minority employees fell under the "small territory" justification (or some other, non-performance-related reason). *See id.* Even if this is true, and the evidence on the point is hazy at best, it appears that seven employees (and thus, necessarily, at least three white employees) were let go for the same reason as Bivens, belying any notion that the sales-territory-based terminations were cooked up as cover to get rid of minority employees. In sum, Bivens's purported "direct, circumstantial, or statistical evidence" of race-based singling out, *Geiger*, 579

F.3d at 622–23, amounts to nothing more than "conjecture," *Walden v. Gen. Elec. Int'l, Inc.*, 119 F.4th 1049, 1056–57 (6th Cir. 2024) (citation modified).

Next, Bivens questions whether Zep needed a workforce reduction at all, viewing the company's temporarily increased sales during the pandemic and its hiring of other new employees as casting doubt on the company's "cost reduction . . . motivation." Br. Appellant 13. Perhaps Zep used poor business judgment in reducing its staffing. But so long as Bivens's termination was in fact based on Zep's "business judgment"—wise or not—and not on "discrimination," her claim fails. *Gatch v. Milacron, Inc.*, 111 F. App'x 785, 791 (6th Cir. 2004). Put differently, a workforce reduction is a valid, nondiscriminatory reason for firing an employee even when the reduction might not have been "entirely necessary from a business standpoint." *Id.* Nor do we doubt that such a reduction "occurred." *Id.* Zep presented unrebutted evidence that the company terminated 22 additional employees at the same time as Bivens. No rational jury could see this as anything but a workforce reduction, motivated by business judgment (of whatever quality).

Finally, shifting gears from our workforce-reduction precedent, Bivens argues that Zep's racial motivation is apparent from the fact that she was replaced by a white employee, Darin Mulcahy, who Zep hired shortly before the workforce reduction. We recognize that an employer may have difficulty hiding behind the workforce-reduction justification if it subsequently replaces the discharged employee. *Schuch v. Savair, Inc.*, 118 F. App'x 16, 21 (6th Cir. 2004). But what new hire can count as a "replace[ment]" for Bivens? *Id.* Only one who "fill[s]" her "position" or assumes her "duties." *Id.* Mulcahy did neither. He was hired to service a territory in western Michigan, while Bivens had served the opposite side of the state. In fact, no employee has been assigned to Bivens's territory since her termination. In sum, neither Mulcahy's hiring nor any of Bivens's other evidence show that she was "singled out" based on her race. *See Geiger*, 579 F.3d at 623.

### III.

That leaves an issue arising out of the discovery process. Bivens argues that the district court erred in denying her motion to compel, filed after the close of written discovery, which

sought to have Moody bring corporate financial documents to his deposition. Ordinarily, we would review the merits of such a decision for an abuse of discretion. *Pittman v. Experian Info. Sols., Inc.*, 901 F.3d 619, 642 (6th Cir. 2018). But Bivens's repeated failure to comply with the Appellate Rules prevents us from meaningfully reviewing her argument.

Bivens violated Rule 28 here too, both by failing to include "a concise statement of the applicable standard of review" for the motion-to-compel issue, Fed. R. App. P. 28(a)(8)(B), and by failing to identify the relevant district court order in either of her appellate briefs, Fed. R. App. P. 28(a)(8)(A) (requiring "citations to" the necessary "parts of the record"). If these were Bivens's only failures, we might opt to ignore them, as we did above. But what we cannot do is supplement the record by ordering a transcript of the "parts of the proceedings" below that are "necessary" to review her argument. *See* Fed. R. App. P. 10(b)(1)(A). The district court's order denying Bivens's motion to compel does not lay out the court's reasoning. Instead, it merely states that the court's reasons for its decision were "explained on the record" during a status conference. Order Den. Pl.'s Emergency Mot. Compel, R. 20, PageID 121. Before we can deem those reasons an abuse of discretion, *see Pittman*, 901 F.3d at 642, we need to know what they are. Yet as Bivens neglected her "duty" of ordering the transcript of that status conference, we do not. Fed. R. App. P. 10 (b)(1) (citation modified). She has thus forfeited any challenge to the district court's ruling. *Lehman Bros. Holdings, Inc. v. Gateway Fund Diversified Mortg. Servs., L.P.*, 785 F.3d 96, 101 (3d Cir. 2015) (noting that "forfeiture is appropriate" when a party's Rule 10 violation indicates "a remarkable lack of diligence").

\*     \*     \*     \*     \*

We affirm the judgment of the district court.